[Civ. No. 5906.   Third Appellate District.—December 16, 1937.]

VINCENT P. RAYMOND, Respondent, v. E. H. CHRISTIAN et al., Appellants.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Appellants.

Thomas C. Ryan and Jack Flinn for Respondent.

THE COURT.—The petitioner had judgment against certain of the defendants above named for the sum of $420,

found by the trial court to be due him on account of unpaid salary or wages as an institutional storekeeper, grade 2, at Napa State Hospital. From the judgment and order denying a new trial the defendants against whom judgment was entered have appealed. As no appeal lies from an order denying a new trial, that portion of the appeal may stand dismissed.

The action was instituted by the plaintiff filing a petition for a writ of *mandamus* to secure a writ directing the payment of the additional sum claimed to be due for his services during certain years by reason of a reclassification of the employees and of the employment in which the plaintiff was engaged, and which classification entitled the plaintiff to wages or salary in addition to that which he had formerly received. The reclassification appears to have been made during the year 1931, but the plaintiff's compensation was not readjusted to conform to such reclassification until some years later.

The consideration of this cause has required extensive investigation as to the different sections of the Political Code having to do with the government of state institutions, and also a consideration of complicated facts and figures. These facts and figures and the several provisions of the Political Code as just mentioned, have been so learnedly considered and set forth by the Honorable Malcolm C. Glenn, the judge of the superior court before whom said action was tried, in an opinion filed by him, that we take the privilege of adopting the same as the opinion of this court, as follows:

"Holding the position of grade 2, institutional storekeeper at Napa State Hospital, and in order to accomplish this result, petitioner seeks a writ of *mandamus* directing the members of the state personnel board to approve and certify a payroll in his favor in the sum of $1,296, together with interest thereon from the various dates he claims the items making up said sum became due, and requiring the state controller to draw his warrant therefor, and the state treasurer to pay the same; and also, to require the state personnel board to grade his salary so that it will correspond with the amount theretofore set by said board.

"On January 8, 1931, petitioner was appointed as institutional storekeeper, grade 2, and at all times has been a civil service employee. Prior to July 9, 1931, institutional store-

keeper was graded into two ranks, rank 'A' and rank 'B'. 'B' was the higher rank. The salary range for rank 'B' was from $140 to $160 per month. When petitioner was appointed his salary was fixed at $100 per month and maintenance, valued at $35. He was receiving less than his grading called for.

"The state civil service commission, sometime prior to July 9, 1931, readjusted the salary range for the position of institutional storekeeper, grade 2, so that commencing on July 9, 1931, the salary range was from a minimum of $150 to $180 per month.

"Notwithstanding the establishment of the minimum salary at $150 per month for said position, on said July 9, 1931, plaintiff continued to receive but $100 in money and his maintenance at the institution valued at $35 per month.

"Petitioner was married June 4, 1933, and secured permission to live off the grounds. From that time on he received $100 for salary, $11 for room allowance, in lieu of occupying a room at the institution, and partook of his noonday meal at the hospital, valued at $8 per month, making a total of $119. This situation continued until November 1, 1935. From November 1, 1933, to date, he has been paid $115 per month salary, an allowance of $11 for room, in lieu of rooming at the institution, and his noonday meal, valued at $8. From July 9, 1931, up to the time he was married and moved off the grounds, there was owing to him $15 per month. From August 1, 1933, to November 1, 1935, there was owing him $31 per month. From November 1, 1935, to date, there would be owing him $16 per month.

"In explanation of the above it is claimed by respondents that petitioner's salary was fixed originally at $100 per month, plus his maintenance, which was valued at $35. As the salary range was fixed by the state civil service commission from $140 to $160, that he was well within that range, and hence received all he was entitled to. Of course this is true, up to July 9, 1931, when the state civil service commission changed the salary range for the position of institutional storekeeper, grade 2, so that from that date it was $150 to $180. Respondents claim that the fact that the minimum salary was raised from $140 to $150 by the state civil service commission had no effect upon petitioner's salary until and unless some action was taken by the appointing

power to bring him within that range. In accordance with this theory we find that whatever allowances were made him, in addition to his salary of $100 per month, were based upon a maximum salary of that amount, and allowances for maintenance based upon the value thereof,—$35 per month. Thus, as pointed out above, after petitioner had married and moved off the grounds, he was allowed $100 salary, $11 for room (because of the fact that he was given permission to move off the grounds and that sum was the value of his room had he continued to occupy one at the institution), and his noonday meal, which was eaten at the institution, valued at $8, making a total of $119,—$16 less than $135. The $16 was charged against him, being the value of two meals each day, although not eaten by petitioner, for the reason that such are the rules of the institution.

"It will be observed also from the foregoing that from November 1, 1935, to date, he had been paid a salary of $115, given an allowance of $11 for room in lieu of rooming at the institution, and his noonday meal valued at $8, making a total of $134, which, adding the $16 value of two meals a day which he did not receive, makes a total of $150. Thus it will be seen that under respondent's theory his salary has been placed within the range of $150 to $180 since November 1, 1935.

"Taking effect from and after July 9, 1931, the state civil service commission regraded the position of institutional storekeeper, grade 2, so far as the salary was concerned, establishing a minimum of $150 per month, and a maximum of $180 per month. Petitioner was given the benefit of this regrading of his position, or the readjustment of the salary range, until August 1, 1935. ■ We are confronted with the query as to whether or not, in view of the raising of the minimum salary to $150, he should have been paid at least that amount in salary and maintenance from and after July 9, 1931.

"Respondent takes the position that to raise petitioner from a salary of $100 per month and maintenance, valued at $35 per month, to a minimum of $150 (which also would include maintenance valued at $35 per month) would be an increase in his salary, and hence falls within the provisions of rule 12 of the state civil service commission; that under said rule a request therefor must first be made by the appoint-

ing power, and cannot be made retroactive; and such request and the procedure therefor were never made.

"The witness Louis J. Kroeger, principal personnel technician of the state personnel board, testified, that to secure an increase of salary the procedure is that the requisition for adjustment is initiated by the appointing power, is forwarded to the personnel board, and is there reviewed to see if the proposal is within the salary range, and then goes to the director of finance for approval; and after his approval, is approved by the personnel board, and becomes final. He also testified: 'Q. Am I correct in stating that the minute the new rules went in on July 9, 1931, creating that grade 2 institutional storekeeper, Mr. Raymond was on the records of the personnel board considered grade 2? A. That is correct, yes. Q. With the pay scale of $150 to $180? A. Yes.'

"Section 5 of the State Civil Service Act provides that the commission shall 'classify positions to be held under state authority in accordance with the provisions of this act, and in accordance with the duties attached to such positions. The commission shall grade all positions within each class with respect to salaries, to the end that like salaries shall be paid for like duties, and shall establish minimum and maximum salary limits for each grade in its classification of positions, and shall provide by rule of advancement of salary within each grade on the basis of efficiency and length of service. Such classes and grades may from time to time be amended, added to, consolidated, or abolished by the commission, but persons holding positions under the original classification or grade shall not be effected thereby. Any appointing power authorized by law to fix the compensation of an employee or employees, subject to the provisions of this act, must so fix said compensation in accordance with the classification and salary schedule herein provided, and subject to the approval of the commission.'

"Under the provisions of section 2153a, Political Code, the medical superintendent of the state hospitals makes the appointment of the various employees. The law is specific that the appointing power must fix the salary or compensation 'in accordance with the classification and salary schedule' provided by the state civil service commission (now the state personnel board).

"The state civil service commission had nothing to do with the fixing of individual salaries. Its duty was as specified in said section 5, to classify positions and grade the same within each class with respect to salaries, and 'establish minimum and maximum salary limits for each grade in its classification of positions'. The appointing power, when given the authority to fix the salary of an employee, must do so within the minimum salary range for each graded position. Whatever salary is fixed must be within the range provided by the commission,—neither below the minimum nor above the maximum. This is mandatory. Language could hardly be made clearer than that found in said section 5,—'Any appointing power authorized by law to fix the compensation of any employee or employees subject to the provisions of this act, must so fix said compensation in accordance with the classification and salary schedule herein provided, and subject to the approval of the commission.'

"When petitioner was first appointed his salary was $100 and maintenance, equaling $135 per month. When the state civil service commission regraded the position of institutional storekeeper, grade 2, it raised the minimum and also the maximum. Respondent claims that this was a raise in petitioner's salary, and hence the appointing power must request that petitioner be placed within the range; otherwise, he would continue to draw the same salary as before action taken by the commission. In one sense it is true that to allow petitioner the minimum salary of $150 would constitute a raise in his salary, but this is not the raise in salary contemplated by rule 12 of the commission, and for convenience all of rule 12 is quoted herewith:

" 'Salary Increases. Section 1. To conform to classification. Advancement of salary within each sub-class or grade shall be based upon efficiency and length of service, and the rate of advancement or the amount of salary increase shall be in accordance with the salary schedule established for each sub-class or grade in the classification of positions as adopted and made a part of these rules.

" 'Section 2. Increases not Oftener than Once a Year. Advancement of salary based upon efficiency and length of service shall be made only upon recommendation of the appointing power and not oftener than once a year, preferably on July 1st of each year, except in emergency cases pre-

sented to and approved by the executive member of the civil service commission.

" 'Section 3. Requests for Increases. All original requests for increases in salaries shall be filed with the civil service commission.

" 'Section 4. Increases not Retroactive. In no case shall advancement of salaries be retroactive.'

"An increase in a salary is fixing a higher amount than formerly received within the range provided,—not giving an employee the minimum salary. If the appointing power could, by either refusing or neglecting to place an employee's name on the payroll at the minimum salary fixed by the commission for his position, where the minimum had been raised by the commission, then the effect would be that any new appointee to a similar position would have to be placed within the new range of salary as provided by law, while the old and faithful employee would continue his old salary at the will and pleasure of the appointing power. The object of the law is to award merit, efficiency and faithfulness. The language of rule 12 is that, 'Advancement of salary within each subclass or grade, shall be based upon efficiency and length of service', certainly this language is not susceptible of the construction that allowing an employee the minimum salary is an advancement of the salary within a grade, and such also is the language found in section 5 of the State Civil Service Act likewise. To give the construction to rule 12 contended for by respondent would directly contravene section 5 of said act that the grading of all positions within each class with respect to salary shall be made 'to the end that like salaries shall be paid for like duties'. If we follow respondent's theory to its logical conclusion, we well might suppose a condition where length of service could result in a serious handicap to an employee, and where many different amounts would be paid to employees holding the same positions. Employees are entitled to the benefits conferred by the act.

"Respondent asserts that petitioner signed the 'Report of Appointment', in which he accepted the compensation, and hence, falls within the rule stated in *Myers* v. *City of Calipatria*, 140 Cal. App. 295 [35 Pac. (2d) 377]. In that case the court stated: 'The appointing board has no power by minute order to reduce the salary of a statutory officer

when fixed by ordinance. Where the officer actually agrees to the acceptance of the reduced salary before his appointment, and, after the salary has been earned, does so accept it, the officer will be held bound by his agreement and contract the same as in any other case. (*De Boest* v. *Gambell*, 35 Or. 368 [58 Pac. 72, 353].)'

"As heretofore stated, when petitioner was appointed there were two grades, rank 'A', with a salary range of $100 to $130, and rank 'B', with a salary range of from $140 to $160. Petitioner's compensation was actually between these two, as he received $100 plus maintenance, valued at $35. But we are not concerned with the amount of his compensation until after July 9, 1931, when the range of salary was established with a minimum of $150 per month. The case cited has no bearing on the situation presented here. True, petitioner signed exhibit 'A', but even if we treat this as an agreement, it must be construed in accordance with the circumstances existing. The fact that an employee of the state, under civil service, agreed to work for the compensation then provided by law, does not have the effect of thereafter precluding him from receiving an increase provided for the position he holds. When an employee of the state, under civil service, accepts a position, he does so with knowledge of the fact that his salary, and, indeed, his conduct, are both subject to the law governing such matters, as set forth in the statute and the rules and regulations of the commission. The petitioner signed nothing more than was required of him, and as required of every employee in the classified service of the state. In doing this he certainly did not waive his rights to any future advantages that might be his under the Civil Service Act.

"Taking the conclusion reached above that petitioner should have been placed on the minimum range of salary basis of $150 per month, then the amount the state is short in the payment of his back salary depends upon questions presented with reference to his maintenance allowances.

"Prior to living away from the institution, he was charged $35 for his maintenance. It is not understood that he makes any objection to this, although he does claim, of course, that from July 9, 1931, up to the time he was permitted to live away from the institution, in June, 1933, he should have

received an additional $15 to make up his salary of $150 per month.

"After he removed from the institution, and up to November 1, 1935, the state continued to pay him $100 for salary, $11 for room, and he ate his noonday meal, valued at $8. The respondents, proceeding on the theory that petitioner's salary to November 1, 1935, was $135, thus deducted $16 for two meals, which were not eaten at the institution by him.

"From November 1, 1935, to date, while there have been added $15 to his payments, giving him $115 salary, $11 for room, and noonday meal valued at $8, he is charged $16 for the two meals not eaten by him at the institution.

"On this phase of the case the question presented resolves itself into the right of the respondents to deduct $16 per month for two meals which have never been consumed by petitioner.

"There is nothing in the rules or regulations of the State Civil Service Act, nor in the rules and regulations of the commission or personnel board with reference to an allowance for maintenance being made for institutional storekeeper. In regard to this, Mr. Kroeger testified: 'Mr. Ryan: Q. Is it a fact that the salary grade for that position that Mr. Raymond holds has been $150 to $180 without mention as to how that should be divided as to maintenance or cash salary? A. There is no specific mention in connection with that particular classification as to that division, that is correct.'

"Certain employees are required by code provision to reside on the premises, but not petitioner. (Sec. 2156, Pol. Code.) And receive their maintenance. (Sec. 2154, Pol. Code.)

"Section 350, Political Code, provides: '. . . So far as consistent with law, the head of each department may adopt such rules and regulations as may be necessary to govern the activities of the department, and may assign to each of the officers and employees thereof, such duties and labors as he may see fit.'

"With regard to state hospitals, the board of managers, subject to approval of the lunacy commission, is given power 'to establish such bylaws, rules and regulations, subject to the approval of the commission, as it may deem necessary and expedient for regulating the duties of officers and em-

ployees of the hospital, and for the internal government, discipline and management of the same'. (Sec. 2150, Pol. Code, subd. 2.)

"By virtue of the provisions of section 2150, Political Code, subdivision 2, the management of the institution has authority to make all necessary rules and regulations concerning the management of the institution and the employees, and hence, the only question which is presented is whether the rules are reasonable and necessary. That it is necessary for certain employees to live on the grounds has been decided by the legislature itself. (Sec. 2156, Pol. Code.) Although the occupant of the position held by petitioner is not mentioned in the statute, that fact would not preclude the making of a rule or regulation to the effect that he must do so.

"Where institutions such as the state hospitals for the insane, have been following a line of practice for a number of years, and such practice has been acquiesced in and recognized not only by those immediately affected thereby, but by other departments of the state, these facts speak rather forcefully as to the reasonableness of the rules upon which the practice is founded.

"The hospital authorities would have no justification for attempting to force any employee to accept less than the amount of his salary as established by law; but, as pointed out above, they do have the right to designate what employees must live on the grounds or at the institution. Concede this to be true, then it must follow that they have the right to fix a reasonable charge for maintenance. Certainly there is nothing in the statute that officers or employees (other than those mentioned in sec. 2154, Pol. Code), are entitled to receive maintenance without charge. There has been no claim made that the value fixed for room rental charge or for the meals, is not reasonable. $11 per month for a room, and $8 per month for each meal is reasonable. From the foregoing analysis it follows that petitioner, as well as other employees, if required by the rules of the institution, must live there; and, being required to do so, petitioner must pay a reasonable amount for maintenance.

"The question might arise as to whether it is reasonable to charge petitioner for meals which he did not consume. In the first place the testimony shows that the superintendent of the hospital construed rules quite liberally in favor of peti-

tioner in granting permission for him to live off the grounds. There is no showing that, having granted petitioner the right to live off the grounds, he could not have availed himself of the privilege of eating all his meals at the institution. The privilege was his, to be exercised as he desired. The evidence shows that he partook of his noonday meal at the institution, but did not have either his breakfast or dinner there, although charged for both. The superintendent was not required to give petitioner permission to room away from the institution because he desired to be married; but he did, nevertheless, grant that permission, and the sum of $11 was added to his salary.

■ "Respondent claims that the department of finance never approved the salary range for institutional storekeeper, grade 2, from $150 to $180 per month, as adopted, and to take effect on and after July 9, 1931, and hence, petitioner never came within that range of salary until November 1, 1935, at which date he was placed therein. (As noted above, even after that date, and to the present time, he is being charged with two meals at the institution, which he does not receive, valued at $16, and hence, since that time is being paid in salary and maintenance only the sum of $134.)

"The respondents base their claim that the department of finance must first approve the adoption of a salary range before it becomes effective, which is based on section 675b of the Political Code as it stood from its effective date in August, 1931. Section 675b did not take effect until August, 1931. The action of the state civil service commission in adopting the salary range for institutional storekeeper, grade 2, acted prior to July 9, 1931. Hence, whatever may be said as to the constitutionality of said section, it could have had no effect upon the action of the said civil service commission, because it was not a law at that time.

"In 1929, section 686 of the Political Code was adopted, which created in the department of finance (established in 1927,—see art. XVIII Pol. Code), a division of personnel and organization, which division includes the state civil service commission. . . . 'The duties, powers, purposes, responsibilities, and jurisdiction now, or which may hereafter be imposed upon the said civil service commission by law, are hereby transferred to said department of finance, which duties, powers, purposes, responsibilities and jurisdictions,

and such additional duties as may be designated to it by the director of finance, shall be administered by and through the division of personnel and organization, under the direction of the state civil service commission. There is hereby created the position of ''chief of the division of personnel and organization'', who shall have civil service status and be selected by the state civil service commission under the terms of the Civil Service Act and its rules and regulations, with the approval of the director of finance. The chief of the division of personnel and organization shall perform the duties imposed upon the executive-member of the commission, as provided in the Civil Service Act . . . ' (Sec. 686, Pol. Code.)

''The duties of the 'executive-member' (Sec. 2 of the State Civil Service Act) were prescribed in the following provision of said section: 'One of said commissioners shall be designated by the governor, to act as president and executive-member of the commission. The names ''commission'' and ''commissioner'', as used in the Civil Service Act, shall be construed to mean and apply to the executive-member, in whom, in all respects, the duties, powers and functions now conferred upon the civil service commission, commission or commissioners are vested and conferred, except that the enactment of the rules and regulations of the commission, the creation and adjustment of classifications and grades, exemptions of positions from under the Civil Service Act, as permitted by law, and dismissals, demotions or other punitive actions placed in the control of the commission, shall be the duty of, and be controlled by the members of the commission, and the votes of two commissioners shall be required to make any action of the commission effective.'

''It will be seen that the division of personnel and organization, which division includes the state civil service commission, was created within the department of finance, and the duties, powers, etc., of the civil service commission were transferred to the department of finance, but they are to be administered by and through the division of personnel and organization under the direction of the state civil service commission. The chief of the division took over the duties and powers of the executive-member of the state civil service commission, but neither he nor the executive-member had the

powers enumerated within the excepted provision as above set forth.

"Section 675b, Political Code, provided, prior to its repeal in 1935, as follows: 'Whenever any state department, board, commission, court or officer fixed the salary or compensation of an employee or officer, which salary is payable out of the state funds, the salary shall be subject to the approval of the state department of finance before it becomes effective and payable.'

"The state civil service commission, as pointed out above, is a division of the 'department of finance'. Not only is this true, but the 'division of personnel and organization' includes the 'state civil service commission'. (Sec. 686, Pol. Code.) And the duties, powers, etc., imposed upon the civil service commission were transferred to the department of finance, 'but shall be administered by and through the division of personnel and organization under the direction of the state civil service commission'. Thus, the matter of classification, grading, etc., of positions was still to be administered by and through the division of personnel and organization, under the direction of the state civil service commission (except the duties of the division which has not the power to classify or to make rules or regulations, etc.). The commission is a division of the department of finance. And when the civil service commission acted in establishing a salary range of from $150 to $180, to take effect on July 9, 1931, it had authority so to do, and, even if it might be said that section 675b, *supra*, subsequently became effective, its act was not counter to that section, for it was a part of the department of finance, and the particular division thereof having to do with that specific matter. As a matter of fact the section has relation to the fixing of salaries by officers and commissions, other than by the department of finance, acting through the state civil service commission. To give it a construction as contended for by respondent would be tantamount to a holding that the department of finance, acting through one of its divisions having the specific duty of establishing classifications and grading positions with relation to salaries, would have to be approved by itself, or that its acts did not meet with the approval of its own department.

"In 1934, article XXIV of the state Constitution was adopted, which relates to state civil service. Thereby a new

state personnel board was created. It also provides for the appointment of an executive officer who shall be a member of the state civil service, but not a member of the board. We find in this amendment, substantially the same language which has heretofore been pointed out with relation to the powers of the executive officer, and the powers reserved in the board itself; we quote therefrom as follows: 'Said executive officer shall perform and discharge all of the powers, duties, purposes, functions and jurisdiction hereunder or which hereafter, by law, may be vested in the board, except that the adoption of rules and regulations, the creation and adjustment of classifications and grades, and dismissals, demotions, suspensions and other punitive action, for or in the state civil service, shall be and remain the duty of the board, and a vote of a majority of the members of said board shall be required to make any action with respect thereto effective.'

"Respondent introduced a certified copy of the order of the state civil service commission which established the salary range to be effective on and after July 9, 1931, for institutional storekeeper, grade 2, at from $150 minimum to $180 maximum, per month. (Exhibit 'E'.) Therein we find the following: 'Pay scales are for classes of positions in the California state service, 1931 edition; proposed rate of pay for classified positions in the California state service. As recommended to the civil service commission and the director of finance by the classification and pay staff, on July 9th, and adopted by the civil service commission subject to review and approval by the director of finance. Institutional storekeeper, grade 2, 150, 160, 170, 180. Pay scale in the California state service, edition of October, 1934; institutional storekeeper, grade 2, 150, (10) 180. Pay scale in the California state service, edition of January, 1936: institutional storekeeper, grade 2, 150 (10) 180.'

"Why the commission, prior to the effective date of section 675b of the Political Code, should have inserted italicized portion in the order made prior to July 9, 1931, is not clear. Said section not being then in force, the provision referred to might well be treated as surplusage; but, as already indicated, it would seem that the action of the board, which is a division of the department of finance, needed no approval of any other division of the department.

"And finally, on this phase of the case, section 675b, *supra*, only deals with cases where the department, board, commission, court or officer 'fixes the salary or compensation of an employee or officer'. As pointed out elsewhere in this opinion, the civil service commission does not fix the salary or compensation of any officer or employee. It does, in accordance with the mandate of the Civil Service Act, classify positions and grade the same and establish maximum and minimum limits for salaries within the grades established, and 'any appointing power authorized by law to fix compensation of any employee or employees, subject to the provisions of this act, must so fix said compensation in accordance with the classification and salary schedule herein provided, and subject to the approval of the commission'. (Civil Service Act.) Nothing could be plainer than this quotation to show the meaning of section 675b, *supra*.

"According to petitioner's contention, and on his theory of the case, as previously stated, there remains unpaid to him:

" (a)  $15 per month from July 9, 1931, to August 1, 1933;

" (b)  $31 from August 1, 1933, to November 1, 1935;

" (c)  $16 per month from November 1, 1935, to date.

"Respondent asserts that under Act 8083, Deering's General Laws, all balances remaining unexpended from the appropriations made by the legislature revert to and become a part of the unappropriated moneys in the general fund four years after said appropriations become available. The appropriation, petitioner states, for the biennium July 1, 1931, to June 30, 1933, would revert to the general fund on July 1, 1933; that for the fiscal year, July 1, 1933, to June 30, 1934, there was a balance of $107.36 left in the appropriation for Napa State Hospital; that for the fiscal year, July 1, 1934, to June 30, 1935, there is a balance of $6,711.51 left in the appropriation for said hospital; and for the fiscal year, July 1, 1935, to June 30, 1936, there is a balance of $1,952.38 left in the appropriation for said hospital. Commenting on this statement he says: 'Thus, if respondent's contention in this regard is correct, petitioner would be unable to receive any money from the state treasury for the years July 9, 1931, to June 30, 1933, and for the years July 1, 1933, to June 30, 1934, he would only be able to receive $107.36, whereas, for the year July 1, 1934, to June 30, 1935, he would be able

to receive the entire amount due him, which would also be true for the period July 1, 1935, to June 30, 1937.

" 'There are some exceptions in said act, by virtue of which moneys appropriated for certain purposes do not revert to the general fund, but it is not necessary to determine whether this is true in this case, for the only funds shown to be remaining and unexpended in the various appropriations made for said hospital are those commencing with the biennium 1933–1935, and as the complaint herein was filed in February, 1936, the four-year period had not expired as to those or subsequent appropriations.

" 'Petitioner contends that he is entitled to a writ of mandate against the controller to compel him to issue his warrant, even though there is no money in the state treasury to pay the same. He cites a number of cases from this jurisdiction, as well as from others, in support of his claim. The first case cited will illustrate that whether the writ shall issue depends entirely upon the statutory provisions governing the situation presented. In that case (*Babcock* v. *Goodrich,* 47 Cal. 488), the court ordered a warrant issued, although there were no funds in the county treasury at the time, for the reason that section 4076, Political Code, dealing with the subject under consideration at that time, provided for so doing:' . . . If the fund is insufficient to pay any warrant, it must be registered, and thereafter paid in the order of its registration.

"Turning to section 433 of the Political Code, designating the duties of the state controller, that section and subdivision 17 thereof provides: 'It is the duty of the controller: . . . 17. To draw warrants on the treasurer for the payment of moneys *directed by law to be paid out of the treasury;* but no warrant must be drawn unless authorized by law, and upon an *unexhausted specific appropriation* provided by law to meet the same. Every warrant must be drawn upon the fund out of which it is payable, and specify the specific appropriation applicable to the payment thereof.' And the Supreme Court has held that this section means exactly what it says. In *Marshall* v. *Dunn, State Controller,* 69 Cal. 223 [10 Pac. 399], the court quotes the provision above set out, italicizing the words italicized above, and citing in support thereof, *Stratton* v. *Green,* 45 Cal. 149, 151, and then states: 'Here the fund specifically appropriated for the traveling expenses

of the plaintiff during the thirty-fifth fiscal year had already been exhausted when the demand was made on the controller for a warrant, and when this proceeding was commenced'. It was held that the controller was not authorized to draw a warrant therefor. (See, also, *Baggett* v. *Dunn, State Controller*, 69 Cal. 75 [10 Pac. 125], and *Butler* v. *Bates*, 7 Cal. 136, which are to the same effect.)

"In 1933, the legislature adopted a new section, numbered 441, Political Code (chapter 605, Stats. 1933), amended in 1935 (Stats. 1935, p. 863). So far as material here, the amendment of 1935 added nothing. The act as originally passed was under consideration by the Supreme Court in the case of *Riley* v. *Johnson*, 219 Cal. 513 [27 Pac. (2d) 760, 92 A. L. R. 1292]. Therein the court states: 'This bill was passed by the legislature in contemplation of the fact that the general fund would be exhausted before the end of the present biennium, and that it would, therefore, become necessary to register warrants. This contingency has now occurred.' It was also contended that the provisions of the act did not constitute an appropriation, as such moneys are received subject to the priorities mentioned therein. It will be observed from the provisions of said section 441 that it, impliedly at least, authorized the state controller to draw his warrant upon the state treasurer even when it represents an amount in excess of the unapplied moneys therein; and it will be recalled that in the instant case the testimony of one of the witnesses was to the effect that the general fund was some thirty or forty million dollars 'in the red'. In answer to the contention last stated, the court stated: 'There can be no doubt that the provisions of the act requiring such warrants, with interest, to be paid from the unapplied moneys in the general fund, subject to the priorities therein provided, as such moneys are received into such fund, constitutes a legal appropriation of so much money as will be necessary to make such payment.' (Citing several early cases.)

"Another point raised was that the act was void for uncertainty because the exact amount appropriated could not be ascertained. In holding this argument not tenable it stated: 'The amount appropriated from the unapplied moneys in the general fund by the act in question is limited by the extent of the principal of the warrants, which, in turn, is limited by the various appropriations made by the

legislature. The amount of interest on the warrants is limited by the amount of principal of the warrants, and can be ascertained by applying a simple mathematical formula to the amount of the principal. This renders the appropriation sufficiently certain.'

''We cite the above case and quote therefrom as above set forth for the purpose of pointing out the authority which exists, notwithstanding the provisions of section 433, subdivision 17, Political Code, for the issuance of warrants even in excess of the unapplied moneys in the general fund. But there is an important matter to be kept in mind so far as petitioner's claim is concerned. It will be observed from the quotation made from the case last referred to, there must be in every case a valid appropriation made by the legislature to meet a claim before a warrant can be drawn therefor: This is the mandate of the Constitution itself. (Sec. 22, art. IV.)

''The effect, therefore, of section 441, Political Code, as originally passed in 1933, and as amended in 1935, upon subdivision 17 of section 433 of the said code, is merely this: There must exist some valid specific appropriation made for the purpose for which the warrant is sought although the fund itself may have been exhausted.

''Petitioner has been unable to show any appropriation for the support of Napa state institution sufficient to cover his claim of the amount he asserts to be due him covering the various years during which he says it arose, other than, or in addition to the various balances remaining in the general fund and to the credit of the Napa State Hospital. His right, if any he has, to a warrant, must be confined to said amounts during the particular biennium involved.

''The general appropriation bills for 1931, 1933 and 1935, make this plain. Section 5 of each of said acts provides, in part, as follows: 'The officers of the various departments, boards, commissions and institutions, for whose benefit and support appropriations are made in this act are expressly forbidden to make any expenditure in excess of such appropriations except the consent of the state department of finance be first obtained, and a certificate in writing duly signed by the director of said department, of the unavoidable necessity of such expenditure, and any indebtedness attempted to be created against the state in violation of the provisions of

this section shall be null and void, and shall not be allowed by the state controller, nor paid out of any state appropriation; . . . ' (Stats. 1935, p. 1199; 1933, p. 840; 1931, p. 319.)

"If the funds designated in the appropriation bill are insufficient, an emergency fund has been provided in the general appropriation bill, the administration of which is committed to the discretion of the department of finance, but petitioner can secure no comfort from the emergency fund created in the general appropriation bills during the past sessions of the legislature, for the discretion of determining whether an emergency exists, and if so, how much money should be transferred, and to what departments, is to be determined by the department of finance. (*Vandergrift* v. *Riley,* 220 Cal. 340 [30 Pac. (2d) 516].) On that phase of the case the court states: 'We therefore conclude that the department of finance, through its executive officer, has the power to determine, in the exercise of a sound discretion, whether an emergency exists as contemplated by item 201 of the budget enactment, and as herein construed, and to order the transfer of money from the emergency fund for a necessary and proper state purpose when no specific appropriation has been made therefor, or when a specific appropriation has been made to a state department, office or purpose, and the same has been found to be insufficient.'

"The setting aside of the emergency fund constitutes an appropriation. On page 349 the court states: 'That the amount set aside "for emergency fund" during the successive sessions of the legislature is an appropriation within the contemplation of the budget amendment to the Constitution and statutes enacted pursuant thereto, cannot be doubted. When so appropriated it becomes part of the funds set aside for the proper functioning of the state government and its several departments, offices and purposes.'

"In the Vandergrift case, *supra,* the director of finance was endeavoring to meet a situation somewhat akin to that petitioner finds himself in, and of course recognized the fact that before he could secure a warrant from the controller he would have to first have a transfer made from the emergency fund to the particular department to be benefited, so that there would be an appropriation for that purpose. Appropriations had been made for items 3, 4, 5 and 6, as mentioned

in the decision, but the appropriation for each was insufficient; if the transfer from the emergency fund had not been authorized and made, there would have been no appropriation for the amount to be transferred from said fund for the specific purpose, and hence, no warrant could have been issued. 'Funds' and 'appropriation' are not the same. 'A fund may exist without provision being made for any appropriation therefrom.' (23 Cal. Jur., p. 555.)

■ "Respondent calls the court's attention to sections 664, 666 and 667, Political Code, and asserts that it is clear from said sections that where the fund or appropriation is exhausted, the claimant's only relief is to secure the approval of the board of control to his claim, and thereafter secure an appropriation for the payment of his claim from the legislature. In answer to this, petitioner states that he is not filing a claim against the state, but is seeking the assistance of the court to compel respondent to perform certain acts enjoined by law; to pay him the salary set by the state personnel board, and which has already been earned by him; that the sections of the Political Code mentioned by respondent's counsel apply to cases where a person has a claim against the state, the amount of which must be fixed or ascertained by the board of control before payment is made; and it does not apply to definite amounts of money due employees of the state as salary, and already earned by them; that, in other words, a state employee whose salary is fixed by law does not have to go before the board of control in order to ascertain the amount he is entitled to, because the personnel board has already determined that amount.

"The rule of course is that 'where it is the plain duty of the board (of control), or the controller, to audit and allow a claim, or issue a warrant thereon, the duty may be enforced.' (23 Cal. Jur., p. 538, citing, *Dufton* v. *Daniels,* 190 Cal. 577 [213 Pac. 949].)

"Respondent does not claim that it is necessary for a claimant to present his claim in every instance, but only where the fund or appropriation is exhausted. Under section 441, *supra*, as construed by the court in *Riley* v. *Johnson, supra*, it is not necessary, where an appropriation has been made by the legislature and the claim has been passed on by the legislature, and an appropriation has been made by it to go through the formality of presenting the claim to the

board of control, even though the fund or appropriation has been exhausted; but, where an appropriation has been made to a department in general appropriation bill, if the funds so appropriated have been exhausted, then there are only two ways of having the claim paid; one, by securing a transfer from the emergency fund; and the other, by presenting a claim to the legislature in accordance with section 666 of the Political Code. Thus, we find that while section 433, subdivision 17, *supra,* specifying the duties of the state controller, is qualified by the provisions of section 441, *supra,* the latter section is limited by section 22, article IV of the state Constitution, and the various boards, departments, etc., are expressly forbidden to expend any moneys in excess of the respective appropriations made therefor.

▆ ''Respondent claims the action is barred in part by the provisions of subdivision 1 of section 338 of the Code of Civil Procedure, although he also pleads other sections as a bar.

''An application for a writ of *mandamus* is a special proceeding of a civil nature, within the rules which govern the statute of limitations. (16 Cal. Jur., p. 775.) 'As is the rule generally in regard to the time of demand in determining whether an action is barred, it is held that a party may not escape the bar of the statute by failure to make a demand within his power at any time.' (16 Cal. Jur., p. 776.) In the case of *Curtin* v. *Board of Police Commissioners,* 74 Cal. App., page 77 [239 Pac. 355], the petitioner had been dismissed as a member of the police department of San Francisco. He waited almost three years before applying for reinstatement, and after that was denied, he filed a petition seeking a writ of mandate to compel his restoration as a member of the said department. Respondents claimed, and the trial court decided, that the proceeding was barred by subdivision 1 of section 338 of the Code of Civil Procedure, and also by laches, and such was respondents' contention on appeal. The appellate court accepted this view and stated: 'We are of the opinion that the contentions made by respondents and the conclusions reached by the trial court must be sustained.' . . . This dismissal occurred at a definitely fixed time, and was an unequivocal denial of his right to longer hold the position of captain of police, or any other position in the department. If his contention as to the illegality of such dismissal is well founded, he could imme-

diately upon his dismissal have perfected his right to the remedy by mandate, by making his demand for reinstatement or assignment to duty as such captain of police. These considerations bring the case within the rule followed and recognized in many cases, that where a right has fully accrued, except for some demand to be made as a condition precedent to legal relief, which the claimant can at any time make if he so chooses, the cause of action has accrued for the purpose of setting the statute of limitations running.' (Citing many cases.)

"The statute (sec. 2153a, Pol. Code) provides for the appointment of employees of state hospitals. Their compensations (within the schedules provided by the civil service commission, now the state personnel board) is provided by law. While it is true that petitioner is not an official, and he draws no official salary, he does occupy a position by appointment under statutory authority, and one classified under the State Civil Service Act. The state civil service board, acting under the Civil Service Act, classified the various positions, graded them with respect to salaries. Examinations are held and eligible lists provided. As vacancies exist from time to time, and as new positions are created, the appointing power fills the same from the eligible list supplied. His appointment is provided for by statute, and his compensation under authority of statute.

"In *Santa Cruz County* v. *McKnight,* 20 Ariz. 103 [177 Pac. 256], the case involved the right of a sheriff to collect his salary, and the statute of limitations was pleaded. It was suggested that because the salary had been fixed by order of the board of supervisors under constitutional authority, it was not a liability created by statute. The court held that it was, and stated further: 'It was intended to cover liability imposed by some written law, either constitutional or statutory, except as limited by other provisions of paragraphs 709 to 718, inclusive, Civil Code of 1913. It meant a liability imposed by the sovereignty in contradistinction to liability growing out of tort or contract.' A number of cases are cited where it has been held that an official salary, compensation or fee is a liability created by statute. Such a liability has been described as 'one which would not exist but for the statute'. (*Hawkins* v. *Iron Val. Furnace Co.,* 40 Ohio St.

507, 515. Cited with approval in *Hocking Valley R. Co.* v. *New York Coal Co.*, 217 Fed. 727 [132 C. C. A. 387].)

"In 16 California Jurisprudence, pages 473, 474, it is stated: 'When a duty exists only by virtue of a statute, or an obligation to pay is fixed in the act itself, the obligation is one created by statute. Thus, an action to recover from a public officer for breach of official duty, fixed by statute, an action by a school teacher, or police officer for reinstatement, or an action by a public officer to recover compensation provided for by a special act, must be commenced within three years.'

"While it is true that petitioner is not an official, and no official salary is provided by statute, nevertheless, he occupied a position provided for by statute, as above noted. He has always been paid monthly, or on a monthly basis. When the salary range was raised to $150 minimum per month, taking effect from and after July 9, 1931, he had the right to demand that his salary of that amount be paid monthly in accordance with such minimum schedule. This he failed to do, and in fact took no action to enforce his right until the filing of the petition herein on February 20, 1936. Subdivision 1, section 338, of the Code of Civil Procedure is applicable to petitioner's claim in so far as it antedates said three-year period mentioned therein.

"From the foregoing, we conclude as follows:

"A. The three-year period of the statute of limitations applies to petitioner's claim; provided, that moneys were appropriated during said years for its payment; if not appropriated, then a claim would have to be presented, approved and allowed in due form, and presented to the legislature. The action was commenced on February 20, 1936. Three years prior to that time would give us the date of February 20, 1933. From July 9, 1931, to the time petitioner was married, the state was $15 short in payment of petitioner's compensation.

"B. August 1, 1933, to November 1, 1935, he received in salary, room allowance and noonday meal, $119. But he had the privilege of eating the other two meals at a valuation of $16, making a total of $135. The state was therefore short $15 per month during that period. The 1933 budget for the Napa State Hospital shows a balance for the fiscal year 1933–34 of $107.36, and for the fiscal year 1934–35 a

balance of $6,711.51. Hence, there are funds to meet this part of said claim.

"C. From November 1, 1935, to date, petitioner has received all that he was entitled to, based on a compensation of $150 per month."

Having reached the same conclusion as the judge of the trial court, set forth in the foregoing opinion, it follows that the judgment should be, and the same is hereby affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 15, 1938.