[S.F. No. 24168. Mar. 12, 1981.]

PACIFIC LEGAL FOUNDATION et al., Petitioners, v.
EDMUND G. BROWN, JR., as Governor, etc., et al., Respondents;
CALIFORNIA STATE EMPLOYEES' ASSOCIATION et al.,
Interveners.

COUNSEL

Ronald A. Zumbrun and Robert K. Best for Petitioners.

John C. Wakefield, Larry C. Larsen, Gilles Attia, A. J. Weiglein, Roger A. Jeanson, Haas & Najarian, Thomas A. Farr and Rex Reed as Amici Curiae on behalf of Petitioners.

Tuttle & Taylor, Raymond C. Fisher, Barbara L. Stocker, Jeffrey M. Hamerling, J. Anthony Kline, Byron S. Georgiou, Barbara T. Stuart, Jerome B. Falk, Jr., Steven L. Mayer, Howard, Prim, Rice, Nemerovski, Canady & Pollak, Barry Winograd, Kristin Jensen, Robert Miller, William P. Smith, Terry Filliman, Gerald Becker and Ronald Blubaugh for Respondents.

Loren E. McMaster, Bernard L. Allamano, Gary P. Reynolds, Richard Lobel, Van Bourg, Allen, Weinberg & Roger, Stewart Weinberg and Robert J. Bezemek for Interveners.

Reich, Adell, Crost & Perry, Hirsch Adell, Charles P. Scully, Donald C. Carroll, Charles P. Scully II, Donald H. Wollett, Ronald Yank, Franklin Silver, Carroll, Burdick & McDonough, Bodkin, McCarthy, Sargent & Smith, Timothy J. Sargent, Kevin W. Horan, Gillin, Jacobson & Wilson, Ralph L. Jacobson and Cynthia T. Podren as Amici Curiae on behalf of Interveners.

OPINION

**TOBRINER, J.**—Over the past 20 years, the California Legislature has enacted a series of legislative measures granting public employees, at both the state and local level, a variety of organizational and negotiating rights somewhat analogous to the rights long afforded most employees in the private sector by the federal labor relation laws of the

1930's. In the instant mandate proceeding, petitioners have mounted a sweeping constitutional challenge to one of the most recent of these public labor relations measures, the State Employer-Employee Relations Act (SEERA), enacted in 1977 to regulate the state's labor relations with state employees. (Stats. 1977, ch. 1159, § 4, p. 3751, codified in Gov. Code, § 3512 et seq.)[1] Petitioners principally contend that SEERA is unconstitutional on its face because it allegedly conflicts with the "merit system" of employment embodied in the civil service provisions of article VII of the California Constitution, and, in particular, with the powers that article VII assertedly assigns exclusively to the jurisdiction of the State Personnel Board. On the basis of these constitutional contentions, petitioners seek a writ of mandate striking down the 1977 statute and compelling the various respondent public officers and agencies to conduct their operations without regard to the provisions of SEERA.

For the reasons discussed below, we conclude that SEERA is not unconstitutional on its face. First, we shall point out that the collective bargaining process established by SEERA does not conflict with the general merit principle of civil service employment established as a constitutional precept by article VII. As we shall explain, although the history and language of article VII demonstrate a clear intent to eliminate the "spoils system" in public employment by raising the principle of appointment and promotion on the basis of merit to constitutional stature, free from potential legislative encroachment, the provisions of SEERA do not conflict with this constitutionally enshrined merit principle. On the contrary, as we shall see, the Legislature carefully crafted the provisions of SEERA with the constitutional mandate of article VII firmly in mind, explicitly reaffirming the continued application of the merit principle in the preamble of the act and fashioning the major elements of the act in a manner calculated to minimize potential conflict with the merit principle.

Second, we shall explain that SEERA does not conflict with article VII in reserving the ultimate salary setting decision with regard to state civil service employees to the Governor and the Legislature, rather than assigning the matter of salary determination to the State Personnel Board. As we shall see, neither the current version of article VII nor its constitutional predecessor contains any language explicitly authorizing the State Personnel Board to set salaries. Although petitioners argue

---

[1]Unless otherwise indicated, all statutory references are to the Government Code.

that the State Personnel Board's designated authority to "classify" positions in the civil service necessarily carries with it the authority to set the salaries for such classifications, consistent legislative practice, judicial construction and, indeed, the State Personnel Board's own interpretation of its constitutional mandate, all refute the petitioners' position. While the State Personnel Board's classification of positions may well operate to constrain the discretion of the Governor and Legislature in establishing salaries, SEERA's provisions do not on their face pose any conflict with the Personnel Board's exercise of its constitutional classification authority.

Finally, we conclude that the provisions of SEERA granting the Public Employment Relations Board (PERB) initial jurisdiction to investigate and adjudicate "unfair practices" are not rendered unconstitutional on their face by virtue of the State Personnel Board's authority, under article VII, section 3, subdivision (a), to "review disciplinary actions" against civil service employees. As we point out, whatever the scope of the State Personnel Board's authority with respect to disciplinary actions there is a substantial area in which PERB's unfair practice jurisdiction does not overlap with the State Personnel Board's jurisdiction at all. Accordingly, for that reason alone, the statutory provision could not properly be invalidated on its face in this proceeding.

Moreover, even in those cases in which the jurisdictions of the two agencies do overlap, the mere possibility of conflict does not call for a drastic or inflexible rule totally curtailing one agency's jurisdiction at the expense of the other's. Instead, we must harmonize the competing procedural schemes in a fashion that will best serve the policies underlying each agency's functions with least injury to the functions of the other. As we point out, our court has applied such a harmonizing principle in the face of similar, potential jurisdictional conflicts in recent cases, and other jurisdictions have adopted similar approaches in dealing with disputes between agencies with functions comparable to the State Personnel Board and PERB.

Thus, we shall conclude that SEERA is not unconstitutional on its face, and that the requested writs of mandate should be denied.

1. *Background and description of the provisions of SEERA.*

Prior to 1961, public employees in California enjoyed no formal rights to participate in the decision-making processes which determined

the terms and conditions of their employment. In 1961, the evolution of public employee rights in this state began with the enactment of the George Brown Act (Stats. 1961, ch. 1964, § 1, pp. 4141-4142, now codified in §§ 3525-3536). As originally enacted, the act applied to employees of the state, cities, counties, school districts and institutions of higher education, granting such employees the right to join employee organizations of their choosing, and requiring public employers to "meet and confer" with employee organizations prior to undertaking action on "all matters relating to employment conditions and employer-employee relations."

Although it represented a significant first step, the George Brown Act omitted a number of key elements that have proven to be important factors in formulating peaceful labor relations in the private sector. Thus the act did not provide any mechanism for recognizing an employee organization as the exclusive representative of a group of employees, and placed no obligation on either the employer or employees to attempt to reach an agreement on terms and conditions of employment, i.e., to negotiate in good faith. Moreover, the act afforded the parties no explicit authority to reach binding agreements and did not establish an expert labor relations agency with authority to oversee the process and devise appropriate remedies for improper conduct by employees or employers.

Subsequent legislative and gubernatorial actions over the past decade and a half have been aimed, in large part, in overcoming these deficiencies and in tailoring the labor relations process to the special conditions of different segments of the public labor force. In 1965, the Winton Act (Stats. 1965, ch. 2041, § 1, p. 4660) expanded the "meet and confer" rights of public school employees, and in 1968, the Legislature enacted the Meyers-Milias-Brown Act (MMBA) (Stats. 1968, ch. 1390, § 1, p. 2725, codified at § 3500 et seq.) to provide a more structured collective bargaining process for most local government employees. (See *Glendale City Employees' Association, Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 334-338 [124 Cal.Rptr. 513, 540 P.2d 609].)

The early 1970's brought an increasing demand among state employees for a formal system of collective bargaining that would provide them with a more meaningful role in establishing the terms and conditions of their employment. (See King, Deliver Us From Evil: A Public History of California's Civil Service System (1979) p. 51.) In response,

Governor Reagan in March 1971 issued an executive order centralizing the "meet and confer" process by designating one state official, chosen by the Governor, to be responsible for meeting and conferring with employee organizations for the purpose of reaching an agreement on salary and employee benefits (Exec. Order No. R-25-71.)[2]

In 1972, following the first major state employee strike, the Legislature created the Assembly Advisory Council on Public Employee Relations, chaired by UCLA Professor Benjamin Aaron, to formulate recommendations "for establishing an appropriate framework within which disputes can be settled between public jurisdictions and their employees." (Assem. Res. No. 51 (1972 Reg. Sess).) In its 1973 report the Advisory Council recommended the enactment of a comprehensive state law, modeled on the National Labor Relations Act, which would afford formal collective bargaining rights to all public employees.

The Legislature, however, was unable to agree on a comprehensive bill covering all public employees and decided instead to draft separate collective bargaining statutes directed to the specific needs and problems of different categories of public entities. In line with this approach, the Legislature in 1975 first enacted the Educational Employment Relations Act (EERA) (Stats 1975, ch. 961, § 2, p. 2247, codified in § 3540 et seq.); EERA repealed the Winton Act, established formal negotiating rights for public school employees, and created the Educational Employment Relations Board, an expert, quasi-judicial administrative agency modeled after the National Labor Relations Board, to enforce the act. In 1977, the Legislature adopted SEERA, the legislation challenged in the instant proceeding, to provide formal collective bargaining rights to state employees. Finally, the legislative sequence was completed in 1978 with the adoption of the Higher Education Employer-Employee Relations Act (HEERA) (Stats. 1978, ch. 744, § 3, p. 2312, codified in § 3560 et seq.), granting similar rights to employees in the state university and University of California systems. As this brief historical overview demonstrates, SEERA constitutes one significant component in a network of recent statutes affording collective bargaining rights to California public employees.

Although a detailed discussion of all of SEERA's provisions is not necessary for the purposes of this decision, it may be helpful to high-

---

[2]In 1975, Governor Brown transferred these duties to a newly created Office of Employee Relations. (Exec. Order No. B-7-75.)

light the major features of the statute. To begin with, the act modifies the George Brown Act in a number of respects in order to strengthen the role of employees and to increase the efficiency of the employer-employee negotiation process. First, the act establishes the principle of exclusive representation on matters of employment relations by employee organizations chosen by a majority of employees in administratively designated bargaining units. (§§ 3520.5, 3521.) Second, the act requires the Governor and the exclusive employee representatives to meet and confer in good faith for the purpose of reaching agreement on wages, hours and other terms and conditions of state employment. (§ 3517.) Finally, the act specifically directs that any such agreement that the parties do reach be set forth in a written memorandum of understanding. (§ 3517.5.)

Although the act thus affords state employees significant new rights, the Legislature at the same time placed definite limits on the scope of representation and retained substantial control over state employee compensation and many other terms and conditions of state employment. SEERA specifically precludes bargaining over "the merits, necessity, or organization of any service or activity provided by law or executive order." (§ 3516.) The act also provides that as to matters within the scope of representation, a memorandum of understanding requiring the expenditure of funds does not become effective unless it is approved by the Legislature in the annual Budget Act (§ 3517.6); under this provision, virtually all salary agreements are subject to prior legislative approval.

The act further provides that, except with respect to a number of specific statutes which the Legislature has expressly determined may be superseded by a memorandum of understanding, any provision of a memorandum of understanding in conflict with a statutory mandate shall not be effective unless approved by the Legislature. (*Ibid.*) In addition, the act provides that any terms of a memorandum of understanding in conflict with specified statutes relating to layoffs or demotions shall not be controlling if the State Personnel Board finds those terms to be inconsistent with the merit employment principles of article VII of the California Constitution. (*Ibid.*)

Finally, to protect the rights and enforce the obligations of employees, employee organizations and the state, SEERA expanded the jurisdiction and changed the name of the Educational Employment

Relations Board to the Public Employment Relations Board (PERB). Under SEERA, PERB's principal responsibilities and duties include: (1) determining appropriate units of employees, (2) determining whether a particular item is within the scope of representation, (3) arranging for and supervising representation elections and resolving disputes relating to certification or decertification, (4) establishing a list of available mediators, arbitrators and factfinders, and (5) investigating unfair practice charges relating to alleged violations of SEERA, and taking such actions with respect to such charges as are necessary to effectuate the purposes of the act. (§§ 3513, subd. (g), 3541.3, 3514.5.)

The provisions of SEERA became operative on July 1, 1978, and PERB proceeded to implement the statute by promulgating regulations and holding hearings to determine appropriate units for bargaining. In January 1979, before this process was complete, petitioners Pacific Legal Foundation and Public Employees Service Association filed an original mandate proceeding in the Court of Appeal contending that SEERA was unconstitutional on its face; two weeks later, the Attorney General, acting on behalf of the People, filed a similar mandate proceeding in the same court raising comparable constitutional contentions.[3] The two proceedings were consolidated and, after extensive briefing and argument, the Court of Appeal, in a divided decision, agreed with petitioners' claims and struck down the statute in its entirety. In light of the obvious importance of the issue, we granted a hearing to resolve the significant constitutional questions presented.[4]

---

[3]In both proceedings, the Governor, PERB, the State Personnel Board and the Controller were named as respondents. Because the Attorney General was representing an interest adverse to the public officers and agencies which he normally represents, the Attorney General consented to the hiring of separate counsel to represent the various respondents. (§ 11040.) The Governor, PERB and the State Personnel Board each retained separate counsel who have represented them throughout these proceedings.

In the Court of Appeal, three employee associations—the California State Employees' Association, International Union of Operating Engineers, and Service Employees International Union, Local 411—sought and were granted leave to intervene in both proceedings, and have fully participated both in the Court of Appeal and this court.

[4]In this court, the Governor renewed a motion, rejected in the Court of Appeal, seeking an order dismissing the mandate action instituted by the Attorney General. Having determined that this distinct issue should appropriately be addressed in a separate opinion, we vacated the order of the Court of Appeal consolidating the two cases and resolve the question raised by the Governor's motion in a decision filed this day in *People* ex rel. *Deukmejian v. Brown* (1981) *ante*, page 150 [172 Cal.Rptr. 478, 624 P.2d 1206].

2. *Petitioners bear a heavy burden in attempting to demonstrate that SEERA is unconstitutional on its face.*

In analyzing petitioners' challenge to the constitutionality of SEERA, we start from several fundamental principles of constitutional adjudication. ■ "Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers *which are not expressly, or by necessary implication denied to it by the Constitution.* [Citations.] . . . [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. *Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.*' [Citations.]" (Italics added.) (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161].)

■ Moreover, our past cases establish that the presumption of constitutionality accorded to legislative acts is particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind. (See, e.g., *San Francisco* v. *Industrial Acc. Com.* (1920) 183 Cal. 273, 279 [191 P. 26].) In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision. Although the ultimate constitutional interpretation must rest, of course, with the judiciary (see *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 176-180 [2 L.Ed. 60, 73-74]), a focused legislative judgment on the question enjoys significant weight and deference by the courts.

■ Finally, in evaluating petitioners' contentions we must bear in mind that petitioners' instant challenge pertains to the constitutionality of the statute *on its face.* To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute, or as to particular terms of employment to which employees and employer may possibly agree. Rather, petitioners must demonstrate

that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.

As we shall explain, under these controlling constitutional principles we conclude that SEERA is not unconstitutional on its face.

3. ■ *SEERA does not conflict with the general "merit principle" of civil service employment embodied in article VII of the California Constitution.*

In challenging the constitutionality of SEERA, petitioners rely primarily on the asserted conflict between the act and several sections of article VII of the California Constitution, the article pertaining to the state civil service.[5] Although, as we discuss below, the principal thrust of petitioners' challenge relates to the legislation's alleged conflict with the duties and powers afforded the State Personnel Board by article VII, section 3, subdivision (a), petitioners apparently also assert more broadly that the entire collective bargaining process adopted by SEERA conflicts with the "general system" of merit appointment and promotion mandated by article VII, section 1, subdivision (b). Because a review of the origins of the constitutional civil service provisions sheds considerable light on all of petitioners' contentions with respect to article VII, we turn directly to the history of the constitutional provision.

In 1913, the California Legislature enacted a statute creating California's first civil service system in an attempt to combat the "spoils

---

[5]Article VII, sections 1, 2 and 3, the constitutional sections most relevant to the present case, provide in pertinent part:

"Section 1. (a) The civil service includes every officer and employee of the state except as otherwise provided in this Constitution.

"(b) In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination.

"Section 2. (a) There is a Personnel Board of 5 members appointed by the Governor and approved by the Senate, a majority of the membership concurring, for 10-year terms and until their successors are appointed and qualified....

"(b) . . . . . . . . . . . . . . . . .

"(c) The Board shall appoint and prescribe compensation for an executive officer who shall be a member of the civil service but not a member of the board.

"Section 3. (a) The board shall enforce the civil service statutes and, by majority vote of all its members, shall prescribe probationary periods and classifications, adopt other rules authorized by statute, and review disciplinary actions.

"(b) The executive officer shall administer the civil service statutes under rules of the board."

system" of political patronage in state employment. (Stats. 1913, ch. 590, p. 1035.) By the early 1930's, however, the existing statutory civil service system was obviously failing in its primary task. The deficiencies in the system stemmed from several principal sources. First, acceding to political pressure, both the Legislature and the statutory civil service commission itself had over the years exempted numerous departments and positions from the civil service restrictions: indeed, by 1932 the exemptions had become so widespread that "[o]f the 23,222 full-time state employees, only 11,917 held permanent civil service positions." (King, Deliver Us from Evil: A Public History of California's Civil Service System (1979) p. 26.) Thus, fully one-half of the permanent state employees were exempt from the civil service law.

"A second abuse of the Civil Service Act was the gross misuse of authorizations for temporary employment [which was not subject to the civil service act].... Officially, temporary appointments followed the three month rule, but this had never been followed. By August 1931, temporary employees constituted more than a third of the entire state service." (*Id.*)

Finally, in the early 1930's considerable public attention was focused on the problem by widespread newspaper accounts of the allegedly numerous politically motivated appointments made by the incumbent Governor. (*Id.* at pp. 26-29.)

It was in this milieu and in response to the specific problems of the times that in 1934 the people adopted article XXIV of the state Constitution. The ballot argument accompanying the 1934 initiative measure sets forth in clear terms both the objectives and the limits of the proposed constitutional provision.

The ballot argument stated: "The purpose of this constitutional amendment is to promote efficiency and economy in State government. *The sole aim of the act is to prohibit appointments and promotion in State service except on the basis of merit, efficiency and fitness ascertained by competitive examination.* Appointments of inefficient employees for political reasons are thereby prohibited, thus eliminating the 'spoils system' from State employment. [¶]...[T]his constitutional amendment provides: (1) Employment in the classified service based solely on merit and efficiency; (2) a nonpartisan Personnel Board; (3) prohibition against exemptions from the merit system of employment;

(4) correction of the temporary political appointment evil. [¶] *Having by constitutional mandate prohibited employment on any basis except merit and efficiency, thereby eliminating as far as possible the 'spoils system' of employment, the Legislature is given a free hand in setting up laws relating to personnel administration for the best interests of the State,* including the setting up of causes for dismissal such as inefficiency, misconduct or lack of funds." (Italics added.) (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 6, 1934), argument in favor of Prop. 7, p. 12.)[6]

As this ballot argument demonstrates, the "sole aim" of the amendment was to establish, as a constitutional mandate, the principle that

---

[6]The complete ballot argument reads as follows: "The purpose of this constitutional amendment is to promote efficiency and economy in State government. The sole aim of the acts is to prohibit appointments and promotion in State service except on the basis of merit, efficiency and fitness ascertained by competitive examination. Appointments of inefficient employees for political reasons are thereby prohibited, thus eliminating the 'spoils system' from State employment.

"Under existing laws the State Civil Service Commission has power to exempt any position from civil service and to authorize employment in State service solely as a reward for political activity. A large number of State positions have from time to time been declared exempt, thereby affording an opportunity for the employment of persons selected solely for political reasons without regard for character, ability, or the best interests of the State. In such cases not only does the State suffer but citizens are not given a fair and equal chance for employment.

"Although the law is supposed to guarantee those already in State employment freedom from the necessity of political activity and stability of employment during good behavior, the non-civil service employee frequently maintains his position through politics rather than through efficient and loyal service to the State.

"The act provides a nonpartisan Personnel Board of five members to serve ten-year terms so staggered that each new Governor will have but one appointment on a five-man board upon taking office. This four-to-one ratio will be an effective means of preventing political interference with the efficient administration of State business.

"The Legislature is prohibited from exempting any group from the merit system of employment although a few agencies are temporarily exempted, with the provision that most of the exempt classes may be included by future legislative act.

"Any present employee who has not passed a competitive examination must serve a probationary period during which, if his services are unsatisfactory, he may be dismissed without formality. Thus, each employee must prove his worth before acquiring permanent status.

"To sum up, this constitutional amendment provides: (1) Employment in the classified service based solely on merit and efficiency; (2) a nonpartisan Personnel Board; (3) prohibition against exemptions from the merit system of employment; (4) correction of the temporary political appointment evil.

"Having by constitutional mandate prohibited employment on any basis except merit and efficiency, thereby eliminating as far as possible the 'spoils system' of employment, the Legislature is given a free hand in setting up laws relating to personnel administration for the best interests of the State, including the setting up of causes for dismissal such as inefficiency, misconduct, or lack of funds."

appointments and promotions in state service be made solely on the basis of merit. Having established this "merit principle" as a matter of constitutional law,[7] and having established a nonpartisan Personnel Board to administer this merit principle, the constitutional provision left the Legislature with a "free hand" to fashion "laws relating to personnel administration for the best interests of the State."

From this description, we conclude that the collective bargaining process established by SEERA does not on its face conflict with the basic constitutional principles of article VII, section 1, subdivision (b).[8]

---

[7]In several briefs filed in this action, respondents—relying on a number of well-respected academic authorities—have drawn a distinction between the terms "merit principle" and "merit system," defining "merit principle" "as the concept 'under which public employees are recruited, selected, and advanced under conditions of political neutrality, equal opportunity, and competition on the basis of merit and competence'" (Vaughn, Principles of Civil Service Law (1976) § 9.3 [6] at p. 9-27), while reserving the term "merit system" for the larger range of personnel functions that have frequently been undertaken by civil service commissions or personnel boards. (See id.; Assem. Advisory Council on Public Relations, Final Rep. (1973) pp. 159-164.) Petitioners, seizing upon the fact that article VII, section 1, subdivision (b) refers to "a general system based on merit," argue that the respondents are in error in claiming that the constitutional provision embodies only the "merit principle" of employment rather than a comprehensive "merit system."

Although the terms "merit principle" and "merit system" may at present be recognized terms of art among the more knowledgeable experts in this field, we do not think that the draftsman of either the 1934 constitutional amendment or the 1970 revision of article XXIV realistically used the language in question in such a specialized sense. Thus, in its section-by-section explanation of the proposed revisions of article XXIV, the California Constitution Revision Commission stated with respect to section 1, subdivision (b): "This subdivision establishes the *merit system* as the *basic principle* underlying the operation of the state civil service." (Italics added.) (Proposed Revision of Arts. III, IV, V, VI, VII, VIII and XXIV of the Cal. Const. (1966) p. 111.)

While the specific terminology itself is not controlling, we think that the 1934 ballot argument makes it quite plain that the draftsmen of the provision intended only "to prohibit appointment and promotion in State service except on the basis of merit," and did not intend to engrave into the state Constitution every aspect of the then current civil service system. Accordingly, because only the narrower concept is involved, we shall refer to the constitutional provision as establishing the "merit principle" of civil service employment.

[8]The current provisions of article VII derive directly from the provisions of former article XXIV. The 1934 version of article XXIV was revised in 1970 under the auspices of the California Constitution Revision Commission, but the revision made no substantive changes in the provisions relevant to this action and merely deleted obsolete and superfluous language from the original provisions. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 3, 1970) pp. 23-24.) Under a constitutional reorganization measure in 1976, article XXIV was repealed but its provisions were adopted verbatim as article VII. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Prim. Elec. (June 8, 1976) pp. 58-59.)

As we have seen, nothing in the history of the amendment suggests that the establishment of a general system of appointment and promotion based on merit proposed to prohibit the Legislature from adopting a labor relations policy affording employees a meaningful voice in determining the terms and conditions of their employment; instead, the amendment simply sought to eliminate the "spoils system" of public employment.

We recognize, of course, that theoretically the *product* of the collective bargaining process may possibly in specific instances conflict with the merit principle of employment embodied in article VII. Such a conflict would be most evident, for example, if the Governor and an exclusive bargaining representative agreed to a memorandum of understanding purporting to authorize hiring or promotion on a politically partisan basis. The provisions of SEERA, however, neither explicitly nor implicitly authorize any such encroachment on the merit principle of article VII through the collective bargaining process. On the contrary, in drafting SEERA the Legislature explicitly reaffirmed the primacy of the merit principle of employment and crafted the statute carefully so as to minimize any potential conflict with such principle.

Thus, section 3512, the preamble of SEERA, states in relevant part: "It is the purpose of this chapter to promote full communication between the state and its employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between the state and public employee organizations.... [¶] *Nothing in this chapter shall be construed to contravene the spirit or intent of the merit principle in state employment, nor to limit the entitlements of state civil service employees...provided by Article VII of the California Constitution or by laws or rules enacted pursuant thereto."* (Italics added.)

Moreover, in designating the statutes that may be superseded by a memorandum of understanding without legislative approval, the Legislature excluded those statutes relating to classification, examination, appointment, or promotion, areas in which a potential conflict with the merit principle of employment would be most likely to occur. Finally, the Legislature's sensitivity to the preservation of the merit principle is additionally evident in the numerous legislative modifications contained in the 1978 "clean-up" legislation to SEERA, changes which were made

largely upon the recommendation of the State Personnel Board to avoid any potential clash with the merit principle.[9]

These numerous provisions demonstrate beyond question that the Legislature drafted SEERA with the merit principle of article VII firmly in mind, fashioning the statute specifically to avoid any conflict with that constitutional mandate. As noted earlier, under familiar principles the legislative judgment in this regard is entitled to great weight, and in light of our own review of the history of article VII, we find no conflict between the general collective bargaining process authorized by SEERA and the merit principle of civil service employment guaranteed by the California Constitution. (Cf. *Los Angeles County Civil Service Com. v. Superior Court* (1978) 23 Cal.3d 55, 62-66 [151 Cal.Rptr. 547, 588 P.2d 249] (local civil service charter provision does not conflict with county's statutory "meet and confer" obligation).)

4. ■ *SEERA does not contravene article VII in authorizing the ultimate setting of civil service salaries by the Governor and the Legislature rather than by the State Personnel Board.*

Petitioners additionally claim that even if the collective bargaining process established by SEERA does not conflict with the merit principle of civil service employment, SEERA nonetheless is unconstitutional because it assigns the task of setting the salaries of civil service employees to the Governor and the Legislature rather than to the State Personnel Board. In this regard, petitioners rely on section 3, subdivision (a) of article VII, the constitutional provision describing the powers and duties of the State Personnel Board, which provides: "The [State Personnel Board] shall enforce the civil service statutes and, by majority vote of all of its members, shall prescribe probationary periods and classifications, adopt other rules authorized by statute, and review

---

[9]In the 1978 amendments to SEERA, the Legislature (1) deleted several statutes from the list of statutes subject to supersession which the State Personnel Board indicated might pose a conflict with the merit principle, (2) provided that nine additional statutes, relating to layoffs and demotions, which had been originally subject to supersession, would not be superseded by a memorandum of understanding if the State Personnel Board finds the terms of the memorandum to be inconsistent "with merit employment principles as provided for by article VII of the California Constitution" and (3) modified two additional statutes which had originally been subject to supersession, transferring the potentially merit-related portions of the statutes into different statutes not subject to supersession, and leaving the nonmerit related subjects in the statutes that remained subject to supersession. (Stats. 1978, ch. 776, §§ 5, 80, 81, 82, 83, pp. 2413-2414, 2452-2453.)

disciplinary actions." Although neither section 3, subdivision (a), nor its constitutional antecedent, explicitly endows the State Personnel Board with the authority to set salaries, petitioners argue nonetheless that the State Personnel Board's constitutional salary setting authority flows both from the Board's authority to "prescribe...classifications" and from its duty to "enforce the civil service statutes." We address each of these contentions in turn.

(a) *The State Personnel Board's constitutional authority to pre-scribe classifications does not encompass the power to set the particular salary for such classifications.*

On its face, SEERA clearly does not conflict with the State Person-nel Board's constitutional authority to prescribe classifications for the state civil service. No provision of the act purports to authorize any other agency to classify positions in the civil service, and the act excludes the numerous statutory provisions relating to the State Person-nel Board's classification power (§§ 18800-18806, 18523) from the list of statutes that may be superseded by the terms of a memorandum of understanding. (§ 3517.6.) Furthermore, the act provides that the State Personnel Board's existing classification structure is one of the specific criteria PERB must consider in determining the appropriate units for the selection of an exclusive representative. (§ 3521, subd. (b)(2).)[10]

Petitioners argue, however, that an integral part of the State Person-nel Board's authority to prescribe classifications is the power to establish salaries for the classifications so set. An almost identical con-tention came before the Colorado Supreme Court in *Vivian* v. *Bloom* (1947) 115 Colo. 579 [177 P.2d 541]. In *Vivian*, the plaintiffs contend-ed that the Civil Service Amendment of the Colorado Constitution vested sole authority to set civil service salaries in the Colorado Civil Service Commission, the counterpart to California's State Personnel Board. Plaintiffs relied upon a provision of the constitutional amend-ment which provided in part that "the standardization of all positions ...and the determination of the grades of all positions in the classified service shall be vested in the commission." (177 P.2d at p. 543.)

---

[10]During the course of these proceedings, PERB determined the appropriate units for state employees; in its unit determination, PERB did not split any individual classifica-tions established by the State Personnel Board. (See *Unit Determination for the State of California* (Nov. 7, 1979) PERB Dec. No. 110-S; (Jan. 11, 1980) PERB Dec. No. 110b-S.)

In *Vivian*, the Colorado Supreme Court rejected the plaintiffs' contention, stating: "It is insistently urged that the power to classify carries with it by necessary implication the power to fix compensation. In this contention we cannot concur. Elsewhere, systems are set up with like divisions of authority. . . . [¶] We are constrained to conclude that the power to fix compensation within the classified service still abides in the [Legislature]. The [Legislature] has the burden of determining and providing for the amount of revenue to be made available for payment of salaries and is immediately responsible to the people's will therein, so it seems not improper that it should retain ultimate control of its ancient prerogative." (177 P.2d at p. 544.)

As the *Vivian* decision suggests, although the power to classify positions has frequently been lodged in civil service commissions or personnel boards, the actual authority to set salaries has traditionally been viewed as a legislative function, with ultimate authority residing in the legislative body. A host of California decisions demonstrate that this fundamental principle has long been followed in this state in jurisdictions operating under civil service provisions. (See, e.g., *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 921 [120 Cal.Rptr. 707, 534 P.2d 403]; *Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education* (1974) 12 Cal.3d 851, 856 [117 Cal.Rptr. 537, 528 P.2d 353]; *City and County of S. F.* v. *Boyd* (1943) 22 Cal.2d 685, 692 [140 Cal.Rptr. 666]; *Sonoma County Bd. of Education* v. *Public Employment Relations Bd.* (1980) 102 Cal.App.3d 689, 694-697 [163 Cal.Rptr. 464]; cf. *Miller* v. *State of California* (1977) 18 Cal.3d 808, 813-814 [135 Cal.Rptr. 386, 557 P.2d 970] (terms and conditions of state civil service employment fixed by statute).)

Petitioners assert, however, that the classification authority granted the State Personnel Board by article VII, section 3, subdivision (a) should be interpreted to include the power to set salaries because under the civil service statutory schemes in force in California since 1913, the State Personnel Board or its predecessor, the Civil Service Commission, has continually been accorded the task of both classifying positions and also establishing salary ranges for the classifications it establishes. (See Stats. 1913, ch. 590, § 5, p. 1036; Stats. 1927, ch. 719, § 1, p. 1314; Stats. 1937, ch. 753, § 70, p. 2094; § 18850.) Petitioners insist that this long-standing practice demonstrates that the power to set salaries is part of the State Personnel Board's constitutional power under article VII.

With the exception of one decision discussed below, however, judicial authorities have uniformly indicated that the State Personnel Board's authority to establish salary ranges rests simply on a delegation of legislative authority under the relevant statutes, and does not reside in the board by virtue of any constitutional mandate. Thus, in *State Trial Attorneys' Assn.* v. *State of California* (1976) 63 Cal.App.3d 298, 303 [133 Cal.Rptr. 712], for example, the court explicitly declared: "Setting compensation for public employees is a legislative function. [Citation.] Section 18850 delegates the function to the Personnel Board." (See also *California State Employees' Assn.* v. *State of California* (1973) 32 Cal.App.3d 103, 107-108 [108 Cal.Rptr. 60]; *Raymond* v. *Christian* (1937) 24 Cal.App.2d 92, 107 [74 P.2d 536]; cf. *Proctor* v. *S. F. Port Authority* (1968) 266 Cal.App.2d 675, 682-684 [72 Cal.Rptr. 248] (discussing specific statute delegating salary setting authority for certain civil service employees to the San Francisco Port Authority).)[11]

This view of both the source and the extent of the salary setting power exercised by the State Personnel Board in the past is directly confirmed by an examination of the actual legislative practice that has been followed in this state since the inception of the civil service system. If the State Personnel Board's salary setting duties flowed directly from the Constitution, as petitioners claim, the board's salary decisions would, of course, be binding on the Legislature. In cases of conflict, one would expect to find that employees have been paid in accordance with the board's rather than the Legislature's mandate. As we shall see, however, in actual practice precisely the opposite has been true.

First, in many years either the Legislature and/or the Governor (by virtue of his "line veto" power (Cal. Const., art. IV, § 10, subd. (b))) have refused to fund the salary increases proposed by the State Personnel Board. According to the brief of the State Personnel Board, its salary recommendations were not followed in 1955, 1958, 1959, 1969,

---

[11]Contrary to petitioners' contention, the case of *Stephens* v. *Clark* (1940) 16 Cal.2d 490 [106 P.2d 874] does not hold nor intimate that the State Personnel Board is empowered by the Constitution to set salary ranges for civil service classifications. In *Stephens*, the court did uphold the personnel board's authority to establish salary ranges prior to the enactment of the 1937 civil service legislation implementing the 1934 constitutional provision. The board's power to set salary ranges during the time period in question in *Stephens*, however, did not flow independently from the board's constitutional classification authority but rather derived from the preexisting statutory authority which was continued in effect, subject to legislative modification or repeal, by the 1934 constitutional amendment. (See former art. XXIV, § 5, subd. (b); 16 Cal.2d at p. 492.)

1970, 1972, 1973, 1974, 1975, 1976, 1977 and 1978. In all of those years, employees received increases in accordance with the determinations of the Legislature and Governor, not the State Personnel Board.

Petitioners argue, however, that while these actions by the Legislature and Governor may demonstrate that the State Personnel Board does not have unlimited power to set salaries in excess of authorized appropriations, such actions do not conflict with a recognition of the board's constitutional authority over the setting of salaries and distribution of funds within appropriated limits. Although the actions noted above may not be inconsistent with such a view, a host of other legislative actions over the years clearly conflicts with even this more limited version of the State Personnel Board's constitutional authority.

Specific legislative directives affecting the manner of distribution of appropriated funds have taken a variety of forms. In some cases, the Legislature has prescribed, by statute, the method by which the State Personnel Board should set the salaries for particular categories of employees.[12] In other instances, the Legislature has directed that a fixed dollar or specific percentage increase be paid either to all state employees or to all employees who fall within a specified income bracket.[13] Finally, on still other occasions, the Legislature has prescribed either a fixed dollar or specific percentage increase for individual categories of

---

[12]As early as 1937, for example, the Legislature directed the board that with respect to salary ranges for laborers, workmen and mechanics employed in state service, salary limits "need not be uniform throughout the state" but should be based on the prevailing wages in the location in which the employees work. (Stats. 1937, ch. 753, § 71, p. 2095, codified in § 18853.) In 1974, the Legislature adopted a somewhat similar provision with respect to the salaries of the California Highway Patrol, providing that salary recommendations for such patrolmen should be based on the estimated average salaries for comparable positions in five specifically enumerated local law enforcement agencies. (Stats. 1974, ch. 723, § 1, p. 1609 codified in § 18850.1.)

[13]In 1943, the Legislature adopted a $25 per month increase for all employees earning less than $300 per month; those earning more than $300 per month, received a $20 per month increase. (Stats. 1943, ch. 62, item 228, p. 297.)

In 1962, the State Personnel Board recommended that 6 percent increases be provided only to those whose yearly salaries were less than $15,000; the Legislature modified the proposal to provide such increases to those earning up to $19,800. (Stats. 1962. Second Ex. Sess., ch. 1, item 282, pp. 485-486.)

In 1969, the Legislature provided that inequity salary adjustments be made only to employees in occupational groups which were 7 percent or more below the prevailing rate and whose monthly salary did not exceed $950. (Stats. 1969, ch. 355, item 297.1, pp. 784-785.)

In 1976, the Legislature directed a $70 per month increase for all state employees, except for the California Highway Patrol which received a $120 per month increase. (Stats. 1976, ch. 341, § 15, p. 938.)

employees, without regard to the State Personnel Board's salary schedule.[14]

These numerous legislative actions, reaching back more than 40 years, demonstrate an unvarying legislative view that the salary setting authority for civil service employees has not been ceded to the State Personnel Board by article VII or its constitutional predecessors, but rather has been left with the Legislature. This consistent legislative interpretation is, of course, entitled to great weight, particularly since the constitutional civil service provision was revised and updated in 1970 without any indication that the drafters intended to alter this established interpretation. (See, e.g., *In re Governorship* (1979) 26 Cal. 3d 110, 117-120 [160 Cal.Rptr. 760, 603 P.2d 1357].)

Moreover, the State Personnel Board itself has consistently concurred in the view that its constitutional authority to prescribe classifications does not encompass the ultimate authority to set civil service salaries. In a 1974 position paper, "A Perspective on Collective Bargaining in the State Civil Service," drafted by the State Personnel Board in response to the then-current legislative study of the issue, the board drew a sharp distinction between the classification power which it believed resided within its exclusive jurisdiction and should not be subject to negotiation, and the authority to set salaries which it concluded did not fall within its aegis and could properly be open to bargaining. Thus, with reference to salaries, the board proposed that "[s]alary and benefit negotiations should become a responsibility of the administration under collective bargaining. The Board staff currently provides the expertise in this area and should continue to perform the staff work related to salary and benefit matters, but administratively responsible to the Governor's negotiator. Salary and benefit data collection and application would be

---

[14]In 1966, the Legislature directed that a category of correctional officers receive a 3 percent increase which the State Personnel Board had not recommended. (Stats. 1966, Second Ex. Sess., ch. 2, item 313.5, p. 1057.)

In 1969, the Legislature provided a $3.6 million appropriation, not requested by the State Personnel Board, to increase the salaries of psychiatric technicians. (Stats. 1969, ch. 1479, § 1, p. 3030.)

In 1970, the Legislature passed a $4.1 million appropriation, not requested by the State Personnel Board, to increase the salary of members of the California Highway Patrol. (Stats. 1970, ch. 1614, § 1, p. 3390.)

In 1972, the Legislature enacted a similar unrequested $5 million appropriation to increase the salaries of employees of the Department of Corrections and the California Youth Authority. (Stats. 1972, ch. 512, § 1, p. 891.)

In 1976, the Legislature provided a $120 per month increase for members of the California Highway Patrol while other state employees received only a $70 per month increase. (Stats. 1976, ch. 341, § 15, p. 938.)

performed in response to management's needs primarily with only minimal data published." (*Id.*, at p. 11.)

Thus, as we have seen, past judicial, legislative and administrative pronouncements and practice all refute petitioners' contention that the State Personnel Board's constitutional authority to prescribe classifications carries with it the constitutional authority to set salaries. As petitioners point out, however, one recent Court of Appeal decision, *Fair Political Practices Com. v. State Personnel Bd.* (1978) 77 Cal. App.3d 52 [143 Cal.Rptr. 393], does contain language contrary to the uniform conclusion of the wealth of authorities discussed above, and suggests instead that the constitutional powers of the State Personnel Board "encompass salary fixing." (77 Cal.App.3d at p. 57.) Although we have no quarrel with the actual result reached in the *Fair Political Practices* case,[15] that decision's conclusion with reference to the constitutional basis of the State Personnel Board's salary setting functions was reached without consideration of the ballot argument accompanying the 1934 constitutional amendment or the consistent judicial, legislative and administrative interpretation and practices which we have reviewed above. In our view these authorities demonstrate that the State Personnel Board's constitutional classification power does not include the power to set salaries. Accordingly, the *Fair Political Practices* opinion is disapproved to the extent that it is inconsistent with the present decision.

Although we have determined that SEERA's salary setting provisions are not inconsistent with the State Personnel Board's authority to prescribe classifications, we do not intend to suggest that the board's classification decisions will have no effect whatsoever on the salary

---

[15]The issue in the *Fair Political Practices* case turned on whether a single state agency, the Fair Political Practices Commission, was itself authorized to set salary levels for civil service employees within the agency without regard to the salary ranges for comparable positions established by the State Personnel Board. The Court of Appeal's conclusion that the commission did not have such power could properly rest on purely statutory grounds, since the governing statute clearly directed that "[t]he Commission shall appoint...employees, consistent with applicable civil service laws" and did not purport to supersede the State Personnel Board's existing statutory authority in the area.

Although as we have noted there is dicta in *Fair Political Practices* contrary to the conclusion we reach above, the court in that case made it clear that it was not purporting to decide the issue before our court in the present case. Thus, the *Fair Political Practices* court noted the recent enactment of SEERA and explicitly disclaimed any intent "to express ourselves on the import of [SEERA] upon the constitutional issue which we here discuss." (77 Cal.App.3d at p. 58, fn. 2.)

measures to which the parties may properly agree under SEERA. (Cf. *Vivian* v. *Bloom, supra,* 177 P.2d at p. 545.) Because we face no specific salary measures which assertedly conflict with the personnel board's classification scheme, we do not believe that we should at this stage attempt to determine precisely what constraints the board's classification decisions will place on permissible salary agreements. (Compare and contrast, e.g., *Sonoma County Bd. of Education* v. *Public Employment Relations Bd., supra,* 102 Cal.App.3d 689; *State Trial Attorneys' Assn.* v. *California, supra,* 63 Cal.App.3d 298; *American Fed. of State etc. Employees* v. *County of Los Angeles* (1975) 49 Cal.App.3d 356 [122 Cal.Rptr. 591]; 54 Ops.Cal.Atty.Gen. 77 (1971).)[16] As with other basic aspects of the "merit principle" of civil service employment, however, the parties are not free to adopt salary measures that interfere with any fundamental "merit principle" element that the classification system serves. This caveat, of course, in no sense renders SEERA unconstitutional on its face; if any improper salary measure should be agreed to by the Governor and approved by the Legislature in the future, petitioners or other interested parties will be free to challenge such measures at that time.[17]

(b) ■ *SEERA does not conflict with the State Personnel Board's authority to "enforce the civil service statutes."*

As noted above, in addition to contending that the salary setting provisions of SEERA conflict with the State Personnel Board's authority to "prescribe classifications," petitioners claim that the act's delegation to the Governor of the power to negotiate and agree to salaries conflicts with the portion of article VII, section 3, subdivision (a) which provides

---

[16]For similar reasons, we have no occasion in this case to determine whether the "like-pay-for-like-work" concept is a constitutionally based doctrine embedded in either the merit principle of article VII, section 1, subdivision (b) or the State Personnel Board's classification power under section 3, subdivision (a), or alternatively is solely of statutory origin. (See, e.g., §§ 18500, subd. (c)(1); 18850.)

[17]In its brief, the State Personnel Board indicates that it intends to promulgate "guidelines" identifying those areas of salary setting that may potentially conflict with the board's classification authority and with the merit principle. The board requests that this court "make clear that the Governor must observe the limits established" by such guidelines.

In our view, any ruling on such guidelines is premature. As of this time, the board has not even formally promulgated the guidelines and there is no indication that the Governor will not voluntarily agree to be guided by the board's advice. Until a concrete controversy arises, it would not be appropriate to express an opinion either upon the authority of the board to promulgate such guidelines or on the substantive validity of any particular guideline.

that "[t]he [State Personnel Board] shall enforce the civil service statutes." Recognizing that the language of the present constitutional provision affords little support to their argument, since SEERA would not normally be thought of as a "civil service statute," petitioners rely instead on the language of former article XXIV, section 3, subdivision (a), the provision from which the current section 3, subdivision (a) derives. (See fn. 8, *ante.*) As we shall explain, however, the provision's history and its consistent interpretation belie petitioners' suggested interpretation.

Former article XXIV, section 3, subdivision (a), adopted in 1934 as part of the original constitutional civil service provision, provided in relevant part that "[the State Personnel Board] shall administer and enforce, and is vested with all of the powers, duties, purposes, functions and jurisdiction which are now or hereafter may be vested in any other state officer or agency under [the Civil Service Act of 1913] or any and all other laws relating to the state civil service *as said laws may now exist or may hereafter be enacted, amended or repealed by the Legislature.*" (Italics added.) Petitioners argue that because the Civil Service Act of 1913 included provisions granting the Civil Service Commission authority to establish salary ranges for civil service classifications, the provisions of former section 3, subdivision (a) should be construed so as to require the Legislature, if it wishes to delegate the salary setting authority to anyone, to make that delegation only to the State Personnel Board. For several reasons we cannot accept petitioners' proposed interpretation.

First, petitioners' suggested construction entirely negates the intent of the proponents of the 1934 constitutional amendment as expressed in the ballot argument accompanying the measure. As we have already seen, other than rendering the "merit principle" in state employment inviolate, the ballot argument explicitly disclaimed any intent to restrict the Legislature to any particular mode of personnel administration. To reiterate, the ballot argument stated in this regard: "Having by constitutional mandate prohibited employment on any basis except merit and efficiency,...the Legislature is given a free hand in setting up laws relating to personnel administration for the best interests of the State...." Section 3, subdivision (a) carried out this intent by explicitly confirming the legislative power to "amend[] or repeal[]" the specific provisions of the civil service law.

Second, contemporary and subsequent legislative acts demonstrate that the constitutional provision upon which petitioners rely has not been construed by the Legislature as precluding it from investing agencies other than the State Personnel Board with administrative responsibilities affecting civil service employees. Thus, for example, over the last half century the Legislature has enacted numerous programs relating to retirement benefits, disability, group life and health insurance, and similar items of compensation for civil service employees, and has placed the administration of such programs in the hands of the Public Employment Retirement System, rather than the State Personnel Board. (§§ 20000-21500, 22000-22603, 21400-21406, 22751-22856.)

Similarly, the Board of Control, rather than the State Personnel Board, has been delegated authority over such compensation-related items as travel and per diem expenses, moving expenses and uniform allowances for civil service employees. (§§ 13920, 13924, 18006, 19460-19465.) And the Governor has been given authority over such employment-related matters as choosing between a four- and five-day work week and designating additional holidays for state employees. (§§ 18020.1, 18025.) Finally, on at least one occasion, the Legislature has explicitly delegated the authority to set civil service salary ranges to an agency other than the State Personnel Board. (See former Harb. & Nav. Code, § 1705.5, enacted Stats. 1957, ch. 2242, § 1, p. 3911 (authorizing San Francisco Port Authority to "establish and adjust salary ranges for laborers, workmen and mechanics employed by it"); *Proctor* v. *S. F. Port Authority, supra,* 266 Cal.App.2d 675, 683-684.) As we have noted earlier, such a pattern of legislative action, evidencing a consistent legislative interpretation, merits great weight.

Under these circumstances, we cannot properly interpret the constitutional provision establishing the State Personnel Board's authority to "enforce the civil service statutes" in the manner urged by petitioners. Although the constitutional amendment established the nonpartisan State Personnel Board to ensure that the merit principle was properly safeguarded, the amendment did not propose to preclude the Legislature from adopting new personnel administration procedures, which do not impinge upon the merit principle, outside of the State Personnel Board's sphere. As the Court of Appeal stated in *California State Employees' Assn.* v. *Williams* (1970) 7 Cal.App.3d 390, 398 [86 Cal.Rptr. 305]: "Article XXIV was presented to California voters in

1934 as a means of establishing a merit system of employment which would eliminate the spoils system. [Citation.] It was not presented as an organic blueprint for the structure of agencies within the state's executive branch."

Nearly 60 years ago this court observed that constitutional provisions "ought not to be construed so as to prevent legislative action adjusted to growing needs and the changed condition of the people." (*Veterans' Welfare Board* v. *Jordan* (1922) 189 Cal. 124, 143 [208 P. 284, 22 A.L.R. 1515].) In light of the history of article VII and its consistent legislative interpretation, we conclude that the provision should not be construed to preclude the Legislature from adopting the collective bargaining salary setting process established in SEERA.

4. ■ *PERB's jurisdiction to investigate and devise remedies for unfair practices is not unconstitutional on its face.*

Petitioners contend that the provisions of SEERA granting PERB jurisdiction to investigate and devise remedies for unfair practices are irreconcilably in conflict with the State Personnel Board's jurisdiction to "review disciplinary actions" under article VII, section 3, subdivision (a).[18] Although petitioners do not complain of any specific issue that has arisen to date, they urge our court to invalidate PERB's authority to act in this area because of an alleged inevitable conflict with the State Personnel Board's powers. We conclude that petitioners' challenge to the facial validity of PERB's jurisdiction fails on several grounds.

First, as the State Personnel Board itself recognizes, many areas of PERB's unfair practice jurisdiction do not overlap with the State Per-

---

[18]The State Personnel Board, asserting that its jurisdiction in the areas of examination, selection, probation, promotion and discipline is "exclusive," joins with petitioners in arguing that PERB's unfair practice jurisdiction is unconstitutional insofar as it authorizes PERB to act with reference to discriminatory or retaliatory actions in any of these areas.

In taking this position in the instant case, the State Personnel Board has modified the views it expressed in its 1974 position paper on collective bargaining. In that document, the State Personnel Board expressly advocated the creation of a Public Employment Relations Commission which would, inter alia, "hear unfair practice complaints." (A Perspective on Collective Bargaining in the State Civil Service, *supra*, p. 9.) The document also stated that the State Personnel Board had considered whether it would be advisable for it to assume the duties of such a commission but had ultimately decided against the board's assumption of such a role because "we believe that the administering agency would be more acceptable to both management and employees if it were an entity with no other involvement in the personnel management process." (*Id.*)

sonnel Board's "disciplinary action" jurisdiction at all. In these areas, obviously, no constitutional problems arise. Thus, for example, if the state denies rights which SEERA grants to employee organizations, or the state fails to meet and confer in good faith, PERB could clearly adjudicate unfair practice charges against the state without any danger of conflict with the personnel board's disciplinary action jurisdiction. Moreover, even in the case of employer reprisals against an employee for protected activity, PERB's unfair practice jurisdiction would clearly pose no conflict with the State Personnel Board's jurisdiction if the reprisal took a form that did not constitute a "disciplinary action" reviewable by the board. Because there is thus a substantial area in which PERB's unfair practice jurisdiction can unquestionably operate without damage to the State Personnel Board's jurisdiction, the provisions in question are not unconstitutional on their face.

Second, even in those areas in which the jurisdiction of the State Personnel Board and PERB do overlap, familiar rules of construction counsel our court to attempt to harmonize the disparate procedures, rather than simply to invalidate one or the other on broad constitutional grounds.[19] As a New Jersey court recently observed in reviewing a conflict between quasi-judicial rulings of a civil service commission and the Public Employee Relations Board in that state: "The inquiry is properly not so much which statutory scheme prevails [over the other], but rather how each can be harmonized to give them reasonable and full effect. [Citations.] Each agency operates under different statutory schemes, but not to defeat each other's authority." (*City of Hackensack v. Winner* (1978) 162 N.J. Super. 1 [392 A.2d 187, 198], affd. (1980) 82 N.J. 1 [410 A.2d 1146].)

As the *Hackensack* decision suggests, PERB and the State Personnel Board are not in competition with each other; rather, each agency was established to serve a different, but not inconsistent, public purpose. The State Personnel Board was granted jurisdiction to review disciplinary actions of civil service employees in order to protect civil service

---

[19]The parties have advanced differing views as to whether, under article XIV, section 1 of the California Constitution, PERB's adjudicatory jurisdiction, like that of the State Personnel Board, flows from the Constitution itself. Although it may well be that PERB should be considered a constitutional agency by virtue of article XIV, section 1 (cf. *Perry Farms Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 460-462 [150 Cal.Rptr. 495]), we need not definitively decide that issue in this case because even if PERB's authority derives only from statute the accommodation of the two agencies' respective jurisdictions would still be appropriate.

employees from politically partisan mistreatment or other arbitrary action inconsistent with the merit principle embodied in article VII. As we noted in *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 202 [124 Cal.Rptr. 14, 539 P.2d 774]: "To help insure that the goals of civil service are not thwarted by those in power, the statutory provisions implementing the constitutional mandate of article XXIV [now article VII]...invest employees with substantive and procedural protections against punitive actions by their superiors." (Fn. omitted.)

PERB, on the other hand, has been given a somewhat more specialized and more focused task: to protect both employees and the state employer from violations of the organizational and collective bargaining rights guaranteed by SEERA. Although disciplinary actions taken in violation of SEERA would transgress the merit principle as well, the Legislature evidently thought it important to assign the task of investigating potential violations of SEERA to an agency which possesses and can further develop specialized expertise in the labor relations field. (Cf., e.g., *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346 [156 Cal.Rptr. 1, 595 P.2d 579]; *San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 11, 13-14 [154 Cal.Rptr. 893, 593 P.2d 838]; *Garner* v. *Teamsters Union* (1953) 346 U.S. 485, 490 [98 L.Ed. 228, 239, 74 S.Ct. 161].)[20] Thus, insofar as possible, we should construe the relevant provisions to permit an accommodation of the respective tasks of both the State Personnel Board and PERB.

Such an accommodation appears particularly appropriate here on a number of grounds. First, nothing in either the language or history of article VII, section 3, subdivision (a) suggests that in granting the State Personnel Board the power to "review disciplinary actions" the drafters intended thereby completely to preclude the Legislature from establishing other agencies whose specialized watchdog functions might also, in

---

[20]As Justice Kaplan of the Massachusetts Supreme Judicial Court has observed in a related context: "Considering the indissoluble linkage of the character of the tribunal, its procedure and the substantive law that it enforces, it seems clear that the parties before the Civil Service Commission would not—and in the nature of things could not—secure from that body alone substantive rights equivalent to those assigned by the statute for enforcement to the other commission. So the idea of using the Civil Service Commission to act as a substitute for the Labor Relations Commission in cases involving employees in the civil service would turn out to be quite unsatisfactory." (*Town of Dedham* v. *Labor Relations Com.* (1974) 365 Mass. 392 [312 N.E.2d 548, 556]; cf. e.g., *Robinson* v. *State Personnel Board* (1979) 97 Cal.App.3d 994 [159 Cal.Rptr. 222].)

some cases, involve the consideration of such disciplinary action. Second, a broad interpretation of article VII, section 3, subdivision (a), reserving to the State Personnel Board alone the authority to inquire into and to remedy any disciplinary action taken against a civil service employee, would reach beyond SEERA and clash with a number of other important statutory procedures as well.

Thus, for example, under sections 12960-12970, the Fair Employment and Housing Commission is afforded authority, analogous to PERB's unfair practice jurisdiction, to investigate claims and to fashion relief, including reinstatement and back pay, for a state employee whom the commission finds has been the victim of racial, religious, sexual or other specifically enumerated employment discrimination. Similarly, under section 132a of the Labor Code, the Workers' Compensation Appeals Board is authorized to afford similar relief to an employee whom it finds has been discharged for filing a worker's compensation claim or for testifying in a worker's compensation proceeding. In like manner, Labor Code section 6312 gives the Division of Labor Law Enforcement the power to investigate and seek relief for an employee whom it finds has been discharged for filing safety claims with the Labor Commissioner.

As these various statutes illustrate, SEERA is only one of a number of instances in which the Legislature has deemed it appropriate to vest a specialized agency, which has familiarity in a particular area, with the authority to protect employees who are discharged or otherwise disciplined for exercising important rights in the agency's field of expertise. We should be reluctant to construe article VII, section 3, subdivision (a) in a manner that would deprive all state civil service employees of the important safeguards afforded by these specialized agencies.

Indeed, in a number of recent cases this court has explicitly eschewed the "meat ax" approach proposed by petitioners and has instead applied harmonizing principles in dealing with overlapping jurisdictional schemes comparable to those present in the instant case. In *Vargas v. Municipal Court* (1978) 22 Cal.3d 902, 910-913, 916 [150 Cal.Rptr. 918, 587 P.2d 714], for example, this court accommodated the municipal court's jurisdiction over unlawful detainer actions and the Agricultural Labor Relations Board's unfair labor practice jurisdiction, recognizing that neither entity completely ousted the other of jurisdiction under all circumstances. Similarly, in *Kaplan's Fruit & Produce*

*Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 67-75 [162 Cal.Rptr. 745, 603 P.2d 1341], we held that the ALRB's jurisdiction over unfair labor practices did not prevent a superior court from granting equitable relief in instances "when the board cannot provide a full and effective remedy." And in *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d 1, 12-14, we held that in light of the expertise which PERB brings to labor disputes arising under the EERA, the superior court which had jurisdiction over an equitable action should have stayed its hand until the specialized agency had initially addressed the dispute.

Because no actual jurisdictional conflict between PERB and the State Personnel Board confronts us in this proceeding, we have no occasion to speculate on how some hypothetical dispute that might be presented for decision in the future should properly be resolved. As numerous authorities in other jurisdictions make clear, however, any conflicts which may arise in this area can be resolved either by administrative accommodation between the two agencies themselves[21] or, failing that, by sensitive application of evolving judicial principles. (See, e.g., *Town of Dedham* v. *Labor Relations Comm., supra,* 312 N.E.2d 548; *City of Hackensack* v. *Winner, supra,* 410 A.2d 1146, *id.* at pp. 1166-1168 (conc. opn. by Pashman, J.), *id.* at pp. 1171-1173 (conc. and dis. opn. of Schreiber, J.); *City of Albany* v. *Public Employment Rel. Bd.* (1977) 57 App.Div.2d 374 [395 N.Y.S.2d 502]; cf. *Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36, 47-60 [39 L.Ed.2d 147, 157-165, 94 S.Ct. 1011]; *Tipler* v. *E. I. duPont deNemours and Co.* (6th Cir. 1971) 443 F.2d 125, 128-129.)

Accordingly, we conclude that the fact that PERB's jurisdiction over unfair practices may in some cases overlap with the State Personnel Board's jurisdiction to review disciplinary actions provides no basis for finding the applicable provisions of SEERA unconstitutional on their face.

---

[21]In Los Angeles County, a jurisdictional conflict between a charter-established civil service commission and a local employment relations commission created by a county ordinance was ultimately resolved by an agreement of each agency to adopt corresponding regulations "which in effect, establish a policy of not hearing any part of a complaint that is within the jurisdiction of, and has been heard by, either an arbitrator or the other commission." (See Assem. Advisory Council on Public Employee Relations, Final Rep., *supra,* pp. 156-158; see also 29 C.F.R. § 1977.18 (OSHA regulation directed to the problem of overlapping jurisdiction when an employee's complaint as to discrimination is also subject to arbitration or some other agency's resolution).)

5. *SEERA is not an unlawful delegation of legislative authority nor does it infringe on the gubernatorial veto power.*

Finally, petitioners contend that even if SEERA does not fatally conflict with any of the provisions of article VII of the California Constitution, our court should strike down the collective bargaining statute on its face as either an unlawful delegation of legislative authority or as an unconstitutional infringement on the gubernatorial veto power. Both of these contentions are plainly without merit.

■ Petitioners' "unlawful delegation" argument rests on the claim that the Legislature acted improperly in providing in section 3517.6 that a memorandum of understanding, agreed to by the Governor and a properly selected exclusive representative of the employees, could supersede certain specifically designated Government Code sections. The statutes in question, however, do not involve fundamental policy determinations, but rather relate to the working details of the wages, hours and working conditions of the employees covered by the act. Past cases of this court demonstrate that the delegation of these kinds of decisions to a public official or agency does not contravene any constitutional precept. (See, e.g., *Meyer* v. *Riley* (1934) 2 Cal.2d 39, 41 [38 P.2d 405]; *Millholen* v. *Riley* (1930) 211 Cal. 29, 35 [293 P. 69]; cf. *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 622, fn. 13 [116 Cal.Rptr. 507, 526 P.2d 971].)

As the New Jersey Supreme Court recently observed in a similar context: "[W]e do not doubt that the Legislature has the power to ordain that collective negotiations may contravene specific as well as general statutes...." (*State* v. *State Supervisory Emp. Ass'n* (1978) 78 N.J. 54 [393 A.2d 233, 245].) Indeed, a contrary conclusion on this point would mean that the public employment collective bargaining procedures in force in a majority of American jurisdictions would be unconstitutional. Since neither the federal nor state Constitutions contain any provision that purports to limit the Legislature's authority to implement such a labor relations policy in the public sector, we find petitioners' argument totally untenable. (Cf. *Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 375-384 [71 Cal.Rptr. 687, 445 P.2d 303].)

■ The claim that SEERA cannot pass constitutional muster because it infringes on the gubernatorial veto power likewise fails. Although SEERA obligates the Governor and exclusive representatives

to bargain in good faith, nothing in the act purports to compel the Governor to agree to conditions that he would feel obligated to "blue pencil" or veto. Since no conflict with the veto power arises on the face of the statute, we have no occasion to determine what remedy, if any, is available under the act in the unlikely event that a governor who has agreed to particular terms in a memorandum of understanding subsequently decides to renege on such agreement through exercise of the veto power. (See *Serrano v. Priest* (1976) 18 Cal.3d 728, 751-752 [135 Cal.Rptr. 345, 557 P.2d 929].)

### 6. *Conclusion*

Following the trend in private industry, the California Legislature in the past two decades has enacted a series of statutes to institutionalize employer-employee relations in the public sector. Structuring a collective bargaining process, first, for most local governmental employees, then for educational employees, and thereafter for higher educational employees, these enactments established a framework for the resolution of employer-employee disputes and the avoidance of work stoppages. One significant thread in the fabric of the state's relationship with its employees is the statute which we have analyzed.

In that enactment, after careful deliberation, the Legislature set up a meticulous and comprehensive procedure for the treatment of the state's employees. That statute is now under manifold attack, chiefly on the ground that it conflicts with the state's civil service system. Yet, as we have shown, it does not at all attempt to nullify the constitutional principle that employment should be based upon merit; indeed, the statute reaffirms that precept. Nor does the statute conflict with constitutional mandate in reserving to the Governor and the Legislature, rather than the State Personnel Board, the setting of salaries, since that power in the relevant past has never been constitutionally ceded to the personnel board. Finally, the statute's grant of initial jurisdiction to the Public Employment Relations Board to adjudicate "unfair practices" creates no facial invalidity because, in case of future disputes, an overlap of the two boards can be reconciled either by negotiation or litigation.

In this ongoing and vital process of evolving employer-employee relations, so necessary to the promotion of harmonious understanding between the parties, the invalidation of this statute would be a sorrowful step backwards.

The alternative writ previously issued is discharged and the petition for a peremptory writ is denied.

Bird, C. J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. The 1977 legislation at issue here (SEERA) is plainly unconstitutional as a gross infringement upon the powers of the State Personnel Board (SPB). Under article VII, section 3, subdivision (a), of the state Constitution, the SPB "shall enforce the civil service statutes and . . . shall prescribe probationary periods and classifications, adopt other rules authorized by statute, and review disciplinary actions." Inherent in the SPB's mandatory obligation to enforce the civil service laws and prescribe "classifications" for state employees is the additional task of assuring that all civil service appointments and promotions are made "under a general system based on merit . . . ." (Art. VII, § 1, subd. (b).) The foregoing responsibilities of SPB are constitutionally imposed.

A "merit" system of civil service includes the predominant and fundamental principle that state employees shall receive "like pay for like work." (See *State Trial Attorneys' Assn.* v. *State of California* (1976) 63 Cal.App.3d 298, 304 [133 Cal.Rptr. 712].) To discharge its constitutional responsibilities, including the maintenance of "merit" principles in state service with "like pay for like work," it is essential that the SPB retain and exercise not only its historic power to specify particular job classifications for state service, but also to fix the salary ranges appropriate for each classification within the gross amount appropriated each year by the Legislature. SPB must carefully adjust the salaries both vertically in accordance with duties, and horizontally to maintain parity both between comparable classes of public employees and with the private sector. The establishment of job "classifications" without control over the salaries for the affected positions within the classification would constitute a meaningless act. Without exercising such power to prescribe salary classifications, the SPB could not possibly assure that the constitutionally mandated merit principle is respected and enforced.

Nevertheless, despite the almost syllogistic truth of the foregoing proposition, the majority upholds a statutory scheme which removes from the SPB all effective controls over the salaries to be paid to rank and file state employees. SEERA purports to transfer the fixing of salaries for nonmanagerial or nonsupervisorial employees entirely to a bargaining process which will inevitably, and inherently, be governed by

political considerations. Thus, under SEERA the salaries for these state employees are negotiated by the Governor and the applicable employee bargaining representative. Although the SPB presumably may suggest guidelines or make recommendations, it can exercise no restraint over the negotiated salaries, maintaining no consistency or equivalency over salary classifications statewide. The SPB's *constitutional* authority to classify state employees in accordance with the civil service merit principle thereby is reduced to the empty and anemic formalism of selecting the titles to be assigned to the various job categories in state service, while the Governor and bargaining representative negotiate and settle the critical salary issues. What neither the Governor nor the majority can explain is how it can reasonably be said that such a bargaining process, inevitably tainted by the familiar pressures of political give-and-take, can possibly comply with the mandate which the sovereign people of California in their Constitution have imposed upon the *SPB to enforce a civil service system "based on merit" and removed from politics.*

The history of the creation and administration of the civil service system in this state reinforces my conviction that SEERA represents an unconstitutional invasion of the authority and responsibility of the SPB. An historic review and analysis of the problem is contained in the careful opinion of Presiding Justice Puglia for the Third District Court of Appeal in this case. Finding its reasoning eminently sound, I set forth and adopt the following pertinent portions of his opinion:

"In 1913, California's first civil service system was created by statute to eliminate abuses in the political spoils system and to establish instead a nonpartisan system of state employment based upon merit. Among the Civil Service Commission's duties were the classification and grading of positions '. . . within each class with respect to salaries, to the end that like salaries shall be paid for like duties. . . .' (Stats. 1913, ch. 590, § 5.)

"In 1927, the commission was given additional powers regarding salary setting; an amendment specified that appointing powers authorized by law to fix the compensation of civil service employees must do so in accordance with the commission's classification and salary schedules subject to the approval of the commission. (Stats. 1927, ch. 719, § 5.)

"In 1934, the state civil service was elevated to constitutional status (Cal. Const., art. XXIV). By initiative, the voters of the state created

the nonpartisan, politically insulated, five-member State Personnel Board as successor to the previous statutory commission. The Constitution vested the SPB with 'all of the power, duties, purposes, functions, and jurisdiction' in administering and enforcing 'any and all other laws relating to the state civil service....' (Cal. Const., art. XXIV, § 3.) Constitutionally delineated powers and duties of the SPB included '...the creation and adjustment of classifications and grades,...' for state civil service employees. (Cal. Const., art. XXIV, § 2, subd. (c).)

"In 1937, the Legislature adopted the State Civil Service Act implementing a comprehensive state personnel system and directing the SPB to fix salary ranges 'for each class of position in the State civil service.' (Stats. 1937, ch. 753, § 70; see § 18850.) The new law emphasized the Legislature's intent not to add to or detract from the constitutional powers, duties and jurisdiction of the SPB. (Stats. 1937, ch. 753, § 243.)

"In 1970, article XXIV of the Constitution was revised....The powers and duties of the SPB delineated in the original sections 2 and 3 (discussed above) were restated and consolidated in new section 3, subdivision (a): 'The board shall enforce the civil service statutes and...shall prescribe probationary periods and classifications, adopt other rules authorized by statute, and review disciplinary actions.'

"The overall intent of the constitutional provisions respecting the civil service remained unchanged; permanent appointment and promotions 'shall be made under a general system based on merit ascertained by competitive examination.' (Cal. Const., Art. XXIV, § 1, subd. (b).)

". . . . . . . . . . . . . . .

"SEERA substantially increases the rights of state civil service employees to bargain collectively. Under its provisions, the Governor, not the affected state department or agency, is designated as the 'state employer' for purposes of bargaining and meeting and conferring in good faith. (§ 3513, subd. (i).) The Governor is required to meet and confer in good faith with respect to wages and hours and other terms and conditions of employment with the exclusive representatives of civil service employees; he is obliged to 'endeavor' to reach agreement on matters within the scope of representation (§ 3517). Agreements are to be reduced to a written memorandum of understanding (§ 3517.5). The

memorandum of understanding takes precedence over any of 122 designated sections of the Government Code, relating generally to salaries, compensation, and other terms and conditions of state employment, with which it is in conflict. Where a memorandum of understanding conflicts with any of another nine specified provisions of the Government Code relating generally to layoffs, the terms of the memorandum control unless the SPB finds they are inconsistent with merit employment principles established by the Constitution (§ 3517.6). If a provision of a memorandum of understanding requires the expenditure of funds or other legislative action for its implementation, such provision shall not become effective unless approved by the Legislature (§§ 3513, subd. (i); 3517.6). Only a 'recognized employee organization' may enter into a memorandum of understanding with the Governor (§ 3515.5).

" . . . . . . . . . . . . .

"From its inception as a constitutional agency the SPB has been charged with prescribing classifications for civil service positions and enforcing the civil service statutes. The main body of the civil service statutes is locat[ed] in title 2, division 5, part 2 of the Government Code commencing with section 18500. That section contains a broad declaration of purpose. 'As though to demonstrate the preeminent and predominant role for the like-pay-for-like-work principle, the Legislature has listed it among the cardinal objectives of the Civil Service Act. Government Code section 18500 proclaims in part: "It is the purpose of this part:...[¶] (c) To provide a comprehensive personnel system for the state civil service, wherein: [¶] (1) Positions involving comparable duties and responsibilities are similarly classified and compensated...."' (*State Trial Attorneys' Assn.* v. *State of California* [*supra*] 63 Cal.App.3d 298, 304.) Accordingly, civil service positions are allocated to a single class where they impose like duties and responsibilities, require similar qualifications for appointment and where 'The same schedule of compensation can be made to apply with equity.' (§ 18801.)

"Section 18850 provides in part: 'The [SPB] shall establish and adjust salary ranges for each class of position in the state civil service. The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities. In establishing or changing such ranges consideration shall be given to the prevailing rates for comparable service in other public employment and in private busi-

ness. The [SPB] shall make no adjustments which require expenditures in excess of existing appropriations which may be used for salary increase purposes....' [Fn. omitted.]

"The process of classification of civil service positions was explicitly related to the principle of like pay for like work in California's first civil service statute. It was there provided that the Civil Service Commission classify positions 'in accordance with the duties attached to such positions' and 'grade all positions within each class with respect to salaries, to the end that like salaries shall be paid for like duties.' (Stats. 1913, ch. 590, § 5.) Although the principle of like pay for like work was not expressly carried over into the Constitution, it remains a part of the statutes which article XXIV directed the SPB to 'administer and enforce.' Except for certain modifications not pertinent here, later amendments to article XXIV have not altered its substantive effect but have merely simplified the language and deleted the anachronistic reference to the Statutes of 1913. (*Fair Political Practices Com.* v. *State Personnel Bd.* (1978) 77 Cal.App.3d 52, 57-58 [143 Cal.Rptr. 393].)

"Our review of the evolution and history of the relevant constitutional and statutory provisions satisfies us that the responsibility to classify civil service positions conferred by the Constitution upon the SPB is inseparable from the responsibility to insure like pay for like work. The latter is thus as much a constitutional command upon the SPB as the former. The uniform application of equal compensation for commensurate duties and responsibilities is essential to an employment system based on classification according to merit. Indeed, as we have demonstrated, the principle of like pay for like work permeates the entire civil service statutes, the enforcement of which the Constitution delegates exclusively to the SPB (Cal. Const., art. VII, § 3, subd. (a)). Therefore we conclude that the authority to fix salaries of civil service employees necessarily reposes in the SPB alone as an integral part of its constitutional power to classify positions. We further conclude that the exclusive exercise of these functions by the politically insulated SPB is essential to the maintenance of 'a general system based on merit' as contemplated by article VII, section 1 of the Constitution. (*Fair Political Practices Com.* v. *State Personnel Bd., supra,* 77 Cal.App.3d at p. 57.) It is in the assignment of the salary-setting function to the bargaining process between the Governor and employee representatives that SEERA comes into fatal conflict with the Constitution.

" . . . . . . . . . . . . . . .

"[We find] unpersuasive...respondents' assertion that the Legislature alone has exclusive jurisdiction to establish salaries with the SPB relegated to a statutorily derived secondary role in which it serves merely as a collector of data upon which to base salary recommendations to the Legislature. The contention overlooks the essential fact that legislative appropriations for salaries are dispensed in a lump sum. While it is true that the SPB cannot 'make...adjustments [to salary ranges] which require expenditures in excess of existing appropriations which may be used for salary increase purposes' (§ 18850), within that limitation the SPB still retains exclusive power to differentiate salaries equitably according to merit classifications in order to foster the 'preeminent and predominant role for the like-pay-for-like-work principle,...' (*State Trial Attorneys' Assn.* v. *State of California, supra,* 63 Cal.App.3d at p. 304.)

"Finally, PERB, joined by the Governor, contends the source of its authority derives from the Constitution and therefore is at least of equal dignity with the powers of the SPB. PERB claims under article XIV, section 1 of the California Constitution which grants the Legislature the authority to 'provide for minimum wages and for the general welfare of employees and for those purposes [the Legislature] may confer on a commission legislative, executive, and judicial powers.'

"Article XIV concerns minimum wages for *all* workers within the state. Unlike article VII, the civil service article, it has no specific application to state employees as distinguished from all workers generally. It is a fundamental rule of construction that a specific provision controls a more general one. (*People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723].) Thus assuming, arguendo, the argument has some abstract validity, article XIV does not afford PERB a source of constitutional power coextensive with that of the SPB. PERB's claim of constitutional authority under the general police power fails for the same reason.

" . . . . . . . . . . . . . . .

"...[T]he act is constitutionally infirm in the particulars heretofore identified and, because the offending parts relating to wages and salaries are not susceptible to severability, the entire act must fall. (*In re Portnoy* (1942) 21 Cal.2d 237, 242 [131 P.2d 1].)

"Ever since the 1913 statutory reform, the vitality of the California merit system has been intimately linked with the principle of like pay for like work. Such constitutionally enshrined precedent is formidable in contrast to the will of a transient, politically sensitive legislative majority in enacting SEERA. (See *City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 696 [125 Cal.Rptr. 779, 542 P.2d 1371].) The 1934 constitutional provision and subsequent amendments thereto clearly manifest 'a purpose of centralizing civil service administration in the State Personnel Board as an agency immune from . . . external and internal pressures. . . . [¶] The civil service system and its import, established by constitutional amendment, may not now or in the future be diluted or derogated by legislative enactment.' (*Fair Political Practices Com.* v. *State Personnel Bd., supra*, 77 Cal.App.3d at p. 58.) Regardless of the salutary motives of the legislative majority in enacting SEERA (see § 3512), any alteration of the import of article VII requires a constitutional mandate by the People."

I would issue the peremptory writ of mandate directing the named respondents to perform their statutory and constitutional duties without regard to the provisions of SEERA.

Clark, J., concurred.

Petitioners' application for a rehearing was denied April 22, 1981. Richardson, J., was of the opinion that the application should be granted.